Herbert Daniel CASTLE, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15520.

United States Court of Appeals
Eighth Circuit.

Nov. 16, 1956.

Joe A. Walters, Minneapolis, Minn., for appellant.

Harold C. Evarts, Asst. U. S. Atty., St. Paul, Minn. (George E. MacKinnon, U. S. Atty., St. Paul, Minn., was with him on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

Herbert Daniel Castle, appellant herein, was proceeded against by indictment in which he was charged with a violation of 18 U.S.C.A. § 371, in that he conspired with one Charles Edgar Reed, Jr., not charged herein, and other persons unknown, to transport stolen motor vehicles in interstate commerce knowing them to have been stolen, in violation of 18 U.S.C.A. § 2312, and to receive, conceal, store, barter, sell and dispose of stolen motor vehicles moving as and which were a part of and which constituted interstate commerce, knowing the same to have been stolen, in violation of 18 U.S. C.A. § 2313. The conspiracy allegedly consisted of a plan whereby the appellant and Reed would acquire wrecked automobiles through purchase and then transfer the motor numbers and serial numbers from the wrecked automobiles to stolen ones. After the transfer of numbers from the wrecks to the stolen cars, the stolen cars were to be transported in interstate commerce and sold. Motor vehicle registration documents pertaining to the wrecks were to be substituted for those of the stolen vehicles.

The indictment charged eight overt acts allegedly performed by the appellant and by Reed to effectuate the objects of the conspiracy.

Appellant was found guilty by a jury, following which the court imposed a sentence of two years' confinement. The appeal to this court raises three claims of error in that: (1) The conviction is not supported by substantial evidence, is contrary to the evidence and to the law; (2) the indictment is fatally defective because the foreman of the grand jury had an adverse interest, was partial, prejudiced, and therefore the court is without jurisdiction; (3) exhibits and testimony were received which were not properly admissible and which were so prejudicial as to deny appellant a fair trial.

In considering the first point raised by the appellant, we must take that view of the evidence which is most favorable to sustaining the jury verdict. As we said in Phelps v. United States, 8 Cir., 1947, 160 F.2d 858, 868:

"It is not for us, on an appeal from a conviction, to weigh the conflicting facts, circumstances and inferences of the trial proceedings, but only to consider whether the evidence in its most favorable aspect to the Government is legally capable of allowing a jury to become persuaded of guilt."

The following is an outline of the activities of Reed and appellant upon which the government relies to sustain conviction. The appellant and Reed were long-time friends, with years of business and social relationship between them. In January, 1954, they decided to go into the business of selling used cars, apparently on a partnership basis. The operation began under the trade-name of Monarch Motors. Premises to be used as a used-car lot were leased at 132 East Lake Street, Minneapolis, with Castle signing the lease, apparently because his credit rating was sufficient whereas Reed's was not. The understanding was that after

the operation got underway a corporation would probably be formed. As an indication of appellant's personal interest in, knowledge of and responsibility for the operations of Monarch Motors, the evidence shows that he supplied the funds to begin operations and personally applied for a license in his own name to operate a used-car lot. He opened a bank account in the name of Monarch Motors, initially having the address for the account as that of his private residence. Later it was changed to 132 East Lake Street. In May, 1954, the appellant executed a power of attorney authorizing Reed to withdraw or deposit funds in the bank account, and to draw and endorse checks in the name of Monarch Motors. The appellant became a notary public and after March, 1954, notarized all transfers and related documents in connection with the operation of the business of Monarch Motors.

For the most part, the inventory of Monarch Motors consisted of older cars, 1950 models and older. There were a few 1951 and 1952 models and one 1953 model. In August, 1954, Reed purchased a wrecked 1954 Chevrolet for Monarch Motors. This car was towed to a private garage where it remained until February or March, 1955, when the appellant had it towed to his home. The appellant stated then that he had received the car in an "insurance deal". At that time appellant stated that he had "bought two or three of them or got two of them and he intended to fix up one of them". Shortly after buying the 1954 wrecked Chevrolet, Reed brought the title card to the partnership place of business so that title could be transferred to Monarch Motors. The appellant notarized the transfer and was aware of the purchase and where the car was stored. Later in August, 1954, another wrecked 1954 Chevrolet was purchased by a person representing himself to be one Charles O'Neil. O'Neil was later identified as Reed. This wrecked car was also placed in a private garage. The title card was brought to the partnership place of business and Castle notarized the transfer from "Charles O'Neil" to Monarch Motors.

On September 1, 1954, two tickets were sold by Capitol Airlines, Inc., for a flight from Minneapolis, Minnesota, to Milwaukee, Wisconsin. The manifest indicated that the tickets were issued to a passenger or passengers under the name "Castle". That same evening in Milwaukee a 1954 Chevrolet was stolen from its owner. A general description of the stolen car conforms with one which the appellant and Reed were later seen using in checking on one of the wrecked cars located in a private garage in Minneapolis. Later the car stolen in Milwaukee was sold by Reed in Iowa, where an inspection disclosed that the numbers appearing on the car at that time were those belonging to one of the wrecked cars purchased by Monarch Motors. The foregoing is typical of several transactions involving wrecked cars whose numbers subsequently appeared upon stolen cars sold by Reed through Monarch Motors after their having been transported in interstate commerce. A detailed recitation of the evidence concerning each transaction is unnecessary here.

Two stolen cars bearing identifications of wrecked cars purchased by Monarch Motors were sold by Reed through the Denver Auto Auction in Colorado. Reed there identified himself as a representative of Monarch Motors. Later, upon receiving information indicating that the cars might have been stolen, the proprietor of Denver Auto Auction attempted to call Reed on long distance telephone. Being unsuccessful in attempting to locate Reed, he asked for the manager of Monarch Motors and talked with the appellant. He informed appellant that the call was about stolen automobiles. Appellant said he didn't know anything about Reed, that Reed wasn't connected with Monarch Motors and never had authority to represent them, and that he didn't know Reed's whereabouts. A few days later appellant received a second

call from the Denver Auto Auction, wherein he was told that the Denver Auto Auction wanted the money for the cars that were stolen and that they were stopping payment on one check that had not as yet cleared. Appellant replied that the cars were not stolen, that they "* * * better not turn down the checks on them and he wanted the money for them". Two days thereafter Reed called the Denver Auto Auction. Upon being informed that the Denver Auto Auction people had reported to the F.B.I. and they thought he should do so too, he replied that the cars were not stolen but he didn't want to go to the F.B.I. "* * * because the story about the cars is so fantastic that no one would believe it". Reed suggested the payment of a couple of hundred dollars to "* * * get somebody to lay off the case".

As an indication of Castle's knowledge of Reed's unlawful activities, Castle subsequently notarized an affidavit by Reed as sales manager of Monarch Motors to the effect that in working on one 1954 Buick sedan, which was sold through the Denver Auto Auction, the number plate on the motor of the automobile was damaged in such a manner as to make its numbers illegible and that he, Reed, restored the original and true number of said plate of the motor. Appellant admits that before he notarized the affidavit he discussed the matter with Reed but that Reed informed him that it only involved a discrepancy in the title and the affidavit was to clear it up. He denied having any knowledge as to what the discrepancy was. Having been apprised by the Denver Auto Auction that they believed Reed sold them stolen cars, the appellant's subsequent actions in first denying that Reed had anything to do with Monarch Motors and then notarizing Reed's affidavit is strangely inconsistent with his claimed lack of knowledge of Reed's unlawful activities. This is particularly true in light of the evidence to the effect that none of the wrecked cars was, contrary to the proposed plan of operation by appellant and

Reed, repaired and thereafter sold. Inasmuch as titles to the wrecked cars purchased by Monarch Motors had been appropriated for use on the stolen automobiles, it would have been impossible to give good title to any of the wrecked cars had they actually been repaired for sale. Evidence to the effect that parts from the wrecked cars purchased by Monarch Motors were actually sold by the appellant himself gives added substance to the theory that there never was any intention on the part of appellant and Reed to repair the cars and sell them, but that they intended instead to use the wrecked car identifications on stolen vehicles.

Criminal conspiracy is, of course, a difficult thing to prove. Persons who so conspire with an unlawful objective do not broadcast their agreements or reduce them to writing. It is only by their actions and by their statements that the unlawful agreement can be brought to light. Here it was Castle's defense that he knew nothing of Reed's unlawful activity and that he was entirely the innocent party, even though funds from the sale of stolen cars or at least a portion of them found their way into the bank account of Monarch Motors. Appellant had known Reed well and been associated with him prior to the formation of Monarch Motors. He participated in the purchasing of wrecked automobiles. He notarized the transfer of titles from wrecked cars to stolen ones. He participated by discussion of and notarization of a false affidavit aimed at patching up title on a stolen car. He ignored every sign post of warning, and there were many, that all was not proper in the business he owned.

█ If wrecked cars were acquired for any purpose other than illegitimate, it is not apparent. Monarch Motors repaired no wrecks, in fact had no repair facilities, and did not even place the wrecks on their business lot but rather chose to keep them out of sight in private garages. The outlined pattern of activity engaged in was such that it is reasonable to conclude Monarch Motors

was a legal front for the illegal operations of Reed and appellant, and that appellant was fully aware of what Reed was doing. We agree with appellant that circumstantial evidence as contrasted with direct evidence is not the most desirable, yet we cannot go so far as to say that the charges here made are a result of piling inference upon inference, for the germ of conspiracy is present throughout. As was said in United States v. Gordon, 7 Cir., 1943, 138 F.2d 174, 176, certiorari denied 320 U.S. 798, 64 S.Ct. 266, 88 L.Ed. 481:

> "It [the crime of conspiracy] is seldom capable of proof by direct testimony and may be inferred from the things actually done. It is enough if the minds of the parties meet and unite in an understanding way with the single design to accomplish a common purpose, which may be established by circumstantial evidence or by deduction from facts from which the natural inference arises that the overt acts were in furtherance of a common design, intent and purpose. The common design is the essence of the crime, and this may be made to appear when the parties steadily pursue the same object, whether acting separately or together, by common or different means, but ever leading to the same unlawful result. If the parties act together to accomplish something unlawful, a conspiracy is shown. Eastern States [Retail Lumber Dealers' Ass'n] v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; Allen v. United States, 7 Cir., 4 F.2d 688; Martin v. United States, 10 Cir., 100 F.2d 490; and Eley v. United States, 6 Cir., 117 F.2d 526."

■ We must hold here, as we do, that the evidence viewed in the light most favorable to sustaining the jury verdict was sufficiently substantial to justify a finding that the appellant and Reed entered into the unlawful conspiracy charged in the indictment and that one or both of them subsequently committed overt acts in furtherance of the objectives of such conspiracy.

■ Appellant's second point is that the indictment is fatally defective because the foreman of the grand jury had an adverse interest, was partial and prejudiced, and therefore the court is without jurisdiction.

Clarence H. Gieske was foreman of the grand jury which returned the indictment against the appellant. He was called as a witness on behalf of the appellant at the time of trial. He testified about a business transaction of the First Security State Bank at St. Paul, Minnesota, of which he was vice president. His testimony was concerned with one of the checks of the Denver Auto Auction, payment on which was being held up through challenging the endorsement of Charles Reed in behalf of Monarch Motors. Gieske testified that he had Castle, the appellant, and one Wiggins who had cashed the check for Reed come to his office at the bank to explain any difficulty with reference to the endorsement. At that time the appellant gave an affidavit to the effect that he was the owner of Monarch Motors and had authorized Reed to operate the business for him; that Reed was authorized to endorse checks for Monarch Motors as well as to sign checks in the name of Monarch Motors; that he had inspected the check of Denver Auto Auction and believed the endorsement "Monarch Motors by Charles Reed" to be genuine.

28 U.S.C.A. § 1861 provides for the qualifications of grand or petit jurors. Among other things, it excludes any person who is:

> "(4) * * * incompetent to serve as a grand or petit juror by the law of the State in which the district court is held."

The law of Minnesota provides, among other things, Minn.Stat.Ann. § 628.54:

> "*Causes of challenge to juror; how tried; decision entered*

"A challenge to an individual grand juror may be interposed for one or more only of the following causes:

\* \* \* \* \*

"(6) That he is a witness on the part of the prosecution, and has been served with process or bound by recognizance as such;

"(7) That a state of mind exists on his part in reference to the case or to either party which shall satisfy the court, in the exercise of a sound discretion, that he cannot act impartially and without prejudice to the substantial rights of the party challenging."

Subsection (6) of the statute is not applicable, since Gieske was a witness on the part of the appellant, not the prosecution. As to subsection (7), there has been no showing on the record to the effect that a state of mind existed on Gieske's part which should satisfy the court, in the exercise of a sound discretion, that he could not act impartially and without prejudice to the substantial rights of the appellant. Indeed, it is difficult to conceive how Gieske could have been prejudiced against the appellant under the circumstances. The appellant came to his office and executed the affidavit he desired in order to clear a check through his bank. In any event, Rule 6(b) (1) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., provides for the manner of challenging a grand juror as follows:

"(1) Challenges. The attorney for the government or a defendant who has been held to answer in the district court may challenge the array of jurors on the ground that the grand jury was not selected, drawn or summoned in accordance with law, and may challenge an individual juror on the ground that the juror is not legally qualified. Challenges shall be made before the administration of the oath to the jurors and shall be tried by the court.

"(2) Motion to Dismiss. A motion to dismiss the indictment may be based on objections to the array or on the lack of legal qualification of an individual juror, if not previously determined upon challenge. An indictment shall not be dismissed on the ground that one or more members of the grand jury were not legally qualified if it appears from the record kept pursuant to subdivision (c) of this rule that 12 or more jurors, after deducting the number not legally qualified, concurred in finding the indictment."

■ The appellant, in order to prevail on this point, must establish two things: First, he must show that Gieske was in fact prejudiced and could not act impartially; second, he must show that after eliminating Gieske as one of the grand jurors the indictment was returned by less than 12 jurors. Here the appellant has established neither and the burden is upon him to establish both.

■■ Appellant's third point is that exhibits and testimony were received which were not properly admissible and which were so prejudicial as to deny appellant a fair trial. The testimony here complained of came out in the cross examination of witness Gillette (a former partner of appellant) and the appellant himself. The cross examination of both Gillette and the appellant had to do with Reed's prior criminal record. Appellant failed to make objection at the time and may not now be heard to raise the question on appeal. Busch v. United States, 8 Cir., 1931, 52 F.2d 79, 88. Under Rule 52(b), Federal Rules of Criminal Procedure, 18 U.S.C.A., only "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." No substantial right has here been affected. In addition thereto, it was shown conclusively that appellant knew before he went into the used-car busi-

ness with Reed that Reed had been convicted of transporting a stolen motor vehicle in interstate commerce. In dealing with a comparable situation, the Court of Appeals for the 6th Circuit took the position that such evidence of prior illegal transactions of a co-conspirator was not competent when used against the defendant on trial unless it could be shown that the defendant "had knowledge thereof or was criminally connected therewith." Wilson v. United States, 6 Cir., 1940, 109 F.2d 895, 896.

Appellant also claims that Government's Exhibits 67, 68 and 69 were improperly received. These exhibits were certified copies of official court records dealing with Reed's two prior convictions—one involving the transportation of a stolen motor vehicle in interstate commerce and the second the receipt and disposal of stolen securities, 18 U.S.C.A. § 2113(c), about which the appellant and Gillette were cross examined as heretofore referred to. Timely objection was made when the government offered the exhibits. The court overruled and error is predicated thereon.

The first time Reed's criminal record was brought to the attention of the jury was in the opening statement of appellant's counsel wherein he referred to the fact that Reed had a felony conviction against him as being the reason why the used-car lot license was taken out in the appellant's name. The next time Reed's criminal record was referred to was in the unobjected-to cross examinations of Gillette and appellant. Even if the exhibits referred to were objectionable, we fail to see where their receipt could result in prejudicial error where they dealt with matters about which the jury had already been at least partially informed through the opening statement of defense counsel and the cross examinations of Gillette and appellant.

This case is in all things affirmed.