**Robert J. BLAUNER, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 16497.

United States Court of Appeals
Eighth Circuit.

Aug. 18, 1961.

Rehearing Denied Sept. 11, 1961.

---

Roberts P. Elam, St. Louis, Mo., for appellant.

William C. Dale, Jr., Asst. U. S. Atty., St. Louis, Mo., for appellee; William H. Webster, U. S. Atty., St. Louis, Mo., on the brief.

Before VOGEL and BLACKMUN, Circuit Judges, and BECK, District Judge.

VOGEL, Circuit Judge.

Robert J. Blauner, Homer W. Stanhope and Robert A. Blauner were indicted by a grand jury in three counts based on charges of willfully attempting to evade income taxes owed by American Lithofold Corporation for the years 1950 and 1951. More specifically, Count 1 charged that the defendants attempted to evade and defeat a large part of the taxes due and owing by Lithofold for the calendar year 1950 by filing and causing to be filed a false and fraudulent return. Count 2 made a similar charge with reference to the year 1951. Both Counts 1 and 2 were alleged to be in violation of § 145(b), Title 26 U.S.C.A. (1939). Count 3 charged that the defendants did willfully and unlawfully conspire, combine, confederate and agree together with the American Lithofold Corporation and with others to defraud the United States of income taxes due and owing it by Lithofold for the years 1950 and 1951, in violation of § 371, Title 18 U.S.C.A.

Count 1 of the indictment was dismissed by the court on the motion of the defendants because of the running of the six-year statute of limitations, 26

U.S.C.A. § 6531 (1954). The defendant R. A. Blauner never having been served and not being present, the court ordered a severance of the charges as to him. Upon trial, the jury returned a verdict of guilty on both Counts 2 and 3 as to Robert J. Blauner. Thereon he was sentenced to concurrent terms of imprisonment for 30 months on each of Counts 2 and 3 and additionally sentenced to pay a fine of $10,000 on Count 2. Homer W. Stanhope was found not guilty. Accordingly, Robert J. Blauner is the sole appellant.

Appellant's first specification of error concerns the court's overruling of his motion made at the close of all the evidence for a judgment of acquittal on both counts. He argues that the evidence was insufficient for the jury to find that he "filed" or "caused to be filed" the 1951 income tax return of American Lithofold Corporation. He also contends that there is no direct evidence to show nor was there evidence from which there could be inferred that he willfully and knowingly attempted to evade or defeat taxes due the United States from Lithofold for the calendar year 1951 or conspired so to do.

In view of the claim of insufficiency, we have found it necessary to review the entire record in detail. In so doing, and in summarizing the testimony and other evidence here, we have in mind the rule expressed in Phelps v. United States, 8 Cir., 1947, 160 F.2d 858, 868, rehearing denied June 13, 1947, 8 Cir., 161 F.2d 940, certiorari denied, 334 U.S. 860, 68 S.Ct. 1525, 92 L.Ed. 1780:

> " * * * It is not for us, on an appeal from a conviction, to weigh the conflicting facts, circumstances and inferences of the trial proceedings, but only to consider whether the evidence in its most favorable aspect to the Government is legally capable of allowing a jury to become persuaded of guilt. Miller v. United States, 8 Cir., 138 F.2d 258, 259; Braatelien v. United States, 8 Cir., 147 F.2d 888, 893."

And Myres v. United States, 8 Cir., 1949, 174 F.2d 329, 332, rehearing denied June 13, 1949, certiorari denied, 338 U.S. 849, 70 S.Ct. 91, 94 L.Ed. 520:

> "In determining the sufficiency of the evidence to support the verdict of the jury, this Court must take that view of the evidence which is most favorable to the government, and give to the government the benefit of all inferences which reasonably may be drawn in its favor. Affronti v. United States, 8 Cir., 145 F.2d 3, 5, and cases cited."

See, also, Castle v. United States, 8 Cir., 1956, 238 F.2d 131, 132; Kansas City Star Company v. United States, 8 Cir., 1957, 240 F.2d 643, 660–661, rehearing denied March 13, 1957, certiorari denied, 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438; Connelly v. United States, 8 Cir., 1957, 249 F.2d 576, 585, rehearing denied December 13, 1957, certiorari denied, 356 U.S. 921, 78 S.Ct. 700, 2 L.Ed.2d 716, rehearing denied, 356 U.S. 964, 78 S.Ct. 991, 2 L.Ed.2d 1072; Northcraft v. United States, 8 Cir., 1959, 271 F.2d 184, 187.

The appellant and Stanhope did not testify in their own behalf. They offered no witnesses and confined their defense solely to two exhibits consisting of correspondence relating to the employment of accountants Ernst & Ernst after Price Waterhouse had withdrawn as their accountant representatives plus a letter dated December 14, 1951, to a Special Agent of the Internal Revenue Service at St. Louis, Missouri, from Lithofold, signed by appellant, to which there was attached copy of a letter dated December 7, 1951, to the Collector of Internal Revenue having to do with Lithofold's *1950* income tax return.

American Lithofold Corporation is a Missouri corporation engaged in manufacturing and selling business forms. Appellant, whose story comes into the picture through statements and admissions made to government agents and others during the investigation of the case, stated to Edward J. O'Leary, Special Agent, Internal Revenue Service,

that he was the president (during 1951), treasurer and the active general manager of Lithofold and that he was, in a general way, responsible for the tax return filed by Lithofold.

The American Carbon Paper Corporation is an Illinois corporation located at Chicago. It manufactures one-time carbon paper and during 1951 sold between 80% and 85% of its total output to Lithofold. It is owned by appellant and his family. A. M. Bridell, appellant's son-in-law, is its president. Appellant is its treasurer.

Robert A. Blauner is the son of the appellant, Robert J. Blauner. Robert A., during the times with which we are concerned, was an employee-agent of Lithofold. Homer W. Stanhope was secretary and comptroller of Lithofold.

Jersey Coast Sales Company was allegedly a partnership consisting of Robert A. Blauner and one Karen Katherine Stewart (Taylor). The latter testified, however, that she couldn't "remember anything definite about it"; didn't recall being in partnership with R. A. Blauner in 1950 and 1951 but might have been; didn't recall doing any work for Jersey Coast Sales or in the name of Jersey Coast Sales, and that she did not do any work during the years 1950 and 1951 for Lithofold on any government contracts in Washington, D. C. It is the government's theory that Jersey Coast Sales was a mere blind set up for the purpose of siphoning to R. A. Blauner Lithofold money improperly transmitted to American Carbon under the guise of cost of "special grade" carbon paper, thereby avoiding the corporate tax thereon.

The J-R Supply Company of Newark, New Jersey, was a partnership consisting of Robert A. Blauner and W. J. Sims. It was the theory of the government that this partnership also was set up for the purpose of siphoning Lithofold profits to Robert A. Blauner so that the books of Lithofold would not properly reflect the true nature of such payments but instead included them as business expense deductions.

Transactions between the appellant and Lithofold on the one side and American Carbon, Jersey Coast Sales and J-R Supply Company of Newark on the other, form a substantial part of the government's case. In addition, however, it is charged that other business expense deductions, particularly those of R. J. Blauner and R. A. Blauner, were highly improper and were used to pay purely personal expenses of appellant and his family, and also that substantial deductions were made which represented travel and other expense having no relationship to Lithofold or its business.

In 1951 Lithofold reported net income of $357,650.37 and taxes due thereon in the amount of $235,577.46. Count 2 of the indictment charged that Lithofold's correct net income for 1951 was $593,127 on which there was a tax due of $406,-698.18. The government asserts that the difference or discrepancy was caused by an intentional overstatement of cost of goods sold by $101,621.43 and by an over-statement of business expense deductions in the amount of $133,855.20.

We consider first the evidence with reference to the government's contention that there was an over-statement of cost of goods sold by Lithofold in the amount of $101,621.43. It was the government's contention that by making an over-statement of cost of goods sold Lithofold's tax liability as reported in its 1951 return was under-stated and that the appellant filed or caused to be filed a false and fraudulent return for Lithofold for the year 1951 for the purpose and with the intent of evading a portion of Lithofold's tax for that year and that a conspiracy so to do was established.

During the years 1950 and 1951 Lithofold obtained certain United States government contracts for the manufacture of business forms. The appellant reported to other employees of Lithofold, including defendant Stanhope, that in order to obtain such contracts for Lithofold it was necessary to pay a certain amount of commission but that by reason of restrictions in a loan agreement which Lithofold had with Reconstruction

Finance Corporation, the commissions would be paid to American Carbon as part of the cost of carbon paper used in the production of the business forms called for in the government contracts. Appellant's devised method of allegedly circumventing the RFC restrictions on payment of commissions was as follows: An officer of Lithofold, in making up pricing sheets and purchase orders, would add an amount equivalent to a commission of 6% to the unit price of the paper, thus allowing American Carbon its normal price and in addition thereto an amount equal to 6% (sometimes 5%) in those cases where it was deemed that commissions were to be paid. In such instances a notation of "special grade" carbon paper was made on the pricing sheets. When Lithofold made a payment, 5/6ths of the extra amount or "commission" was then passed on to Jersey Coast Sales by American Carbon, the latter retaining 1/6th itself. The excess or overage above the normal price or value of carbon paper paid by Lithofold to American Carbon during the years 1950 and 1951 amounted to the sums of $44,478.13 and $101,621.43 respectively. The net result was that 5/6ths of the over-payments by Lithofold to American Carbon went to appellant's son, Robert A. Blauner, operating as Jersey Coast Sales or as a partner of Jersey Coast Sales.

William J. Halliday, office manager of American Carbon, testified with reference to the excess price paid by Lithofold to American Carbon over and above the established list price. On those orders where an excess was to be paid Lithofold's purchase orders would be marked "Jersey Coast Sales". He testified that this excess was considered as commission, put in the commissions account and paid out as such to Jersey Coast Sales. Halliday was unaware of who or what the Jersey Coast Sales Company was. He merely made out most of the checks. (Some of them, however, were signed by R. J. Blauner, the appellant.) Halliday testified that 1/6th of the excess payments was retained by American Carbon. That was to cover their "expense of the transaction". This scheme was at the direction of the appellant, R. J. Blauner. Blauner gave Halliday the same explanation for these transfers as he gave to employees of Lithofold; that is, that it was necessitated by the RFC restrictions on Lithofold's salaries and sales commissions. He did not explain to Halliday who Jersey Coast Sales actually was. One of the so-called commission checks made out by American Carbon was, however, payable directly to R. A. Blauner.

William J. Sims testified that he was employed to run the Washington office of Lithofold. He handled government printing contracts for Lithofold. He was paid strictly on a commission basis. He "had an arrangement" with R. A. Blauner whereby he and R. A. Blauner split the commission, each getting 50%. They set up what they called the J-R Supply Company as a commission partnership which continued from July 1, 1950 to June 30, 1952. During that period they split approximately $175,000. The sole income of the partnership was from commissions on government contracts. The commissions came in the form of checks from American Lithofold payable to W. J. Sims. Sims would deposit the checks in his personal account and then draw a check thereon payable to R. A. Blauner. The only business records kept were his bank statements and his check book. R. A. Blauner explained to him why Lithofold couldn't pay them direct. He told Sims "that on account of his in-laws he wanted it all paid to me" (Sims). At the same time R. A. Blauner was operating the New York office. Sims recalled one instance when the J-R Supply Company was discussed with R. J. Blauner, the appellant, that being in Washington late in 1951. Sims at that time had a Lithofold commission check which he had not split with R. A. Blauner and the appellant asked him, Sims, when he was going to do it, saying, "he's your partner", or words to that effect. Sims testified that R. A. Blauner went to Cuba in January, 1951. Sims continued to split commissions with him by either mailing him his check or wiring the money to him.

In addition to splitting commissions with R. A. Blauner through the so-called partnership, Sims also handled other payments for R. A. Blauner after Blauner went to Cuba. These were the "commissions" from American Carbon to Jersey Coast Sales covering the over-payments from Lithofold. The first of such checks came to Sims in April, 1951. Blauner had explained to him that he would be traveling, that Sims would know where he could be reached, and that Sims was to get the money and send it to him wherever he was. No portion of these moneys was retained by or belonged to Sims. This arrangement for transmitting money from American Carbon payable to Jersey Coast Sales on to R. A. Blauner continued through most of 1951. During that period Sims received from American Carbon and passed on to R. A. Blauner approximately $89,000. The checks from American Carbon were generally payable to "Jersey Coast Sales" or "W. J. Sims, Agent, Jersey Coast Sales". Sims had no connection with or interest in Jersey Coast Sales whatsoever other than to receive and deposit checks payable to it and remit the entire proceeds thereof to R. A. Blauner. Sims first heard of Jersey Coast Sales about the time R. A. Blauner went to Cuba.

American Lithofold's books failed to reflect the true significance of the over-payments to American Carbon. On their books the 6% added to the cost of the carbon paper was included in the cost of sales. Lithofold's books further failed to correctly reflect the payments that found their way into R. A. Blauner's pockets through the medium of Sims and the J-R Supply Company. All of the commissions on the government business, half of which went to R. A. Blauner through the phantom J-R Supply Company, appear on the books of Lithofold as being payment of commissions to Sims alone.

Price Waterhouse and Company made audit examinations and prepared tax returns for Lithofold for the years 1943 to 1950, inclusive. During the course of their auditing they discovered that on certain orders Lithofold had been paying American Carbon an amount in excess of what it had been paying for the same paper on other orders. In June, 1951, Benjamin F. Jackson, a partner in Price Waterhouse, went to Chicago to discuss the matter with the appellant and A. M. Bridell, president of American Carbon. Jackson had a draft of his accountant's audit report which was discussed. The appellant said that, "he felt undue emphasis was being placed in our report on this particular matter", that is, the excess payments to American Carbon. Bridell asked Jackson if it was customary for them to put so much emphasis on this matter in a report and "said with regard to clients, for instance, in the steel industry, who might be dealing in the gray or black market, was it common for us to make reference to this item." Jackson replied to the appellant and Bridell, that in the first place the amount was significant and in the second place, the relationship between the companies was significant and that therefore they felt a statement had to be made. Subsequently a meeting was held on November 7, 1951, in the office of John R. Green, the latter being Lithofold's attorney. At that meeting it was disclosed that R. A. Blauner, in addition to being paid $3,000 per month by Lithofold, was also financially interested in the company known as Jersey Coast Sales, which was the company receiving a commission paid through American Carbon; that, further, R. A. Blauner was a principal partner in the J-R Supply Company of Newark, New Jersey, and that this latter company had been receiving commissions from Lithofold through Sims, who was listed as an independent agent in Washington. Other conferences followed. Green advised that in his opinion a very serious matter was presented, particularly because of the relationship between R. A. Blauner and R. J. Blauner; that Lithofold should inform the Bureau of Internal Revenue as promptly as possible what the facts were; that the situation might be construed as a concealment on the part of the company and might lead

to fraud charges where the method of payment was such that amounts that eventually went to Robert A. Blauner were not reflected in the company's records; that because of the relationship a question might be raised as to whether this was a method of paying excessive compensation to R. A. Blauner, and that on this basis it would be a question of whether taxes should be withheld on the amounts paid to R. A. Blauner. At a meeting held on November 17, 1951, in the office of Attorney Green, appellant called his son, R. A., in Havana, Cuba, and discussed the matters with him in the presence of the others. R. A. claimed to have become a resident of Cuba and that it was not necessary for him to file tax returns for the year 1951. Mr. Green advised those present that the company should make sure that, not only with regard to information in 1950, but also that in 1951, the accounts should show clearly the ultimate recipients of any of these commissions and amounts being paid. Price Waterhouse withdrew from its representation of Lithofold by letter dated December 10, 1951. As a result of the meetings, the following letter to the Internal Revenue Collector was finally drafted:

"December 7, 1951.

"Collector of Internal Revenue,
"Federal Building,
"St. Louis, Missouri.
"Dear Sir:

"We desire to advise that the income tax return filed by us for the year 1950 was incorrect in the following respects:

"1. The cost of materials in Schedule A and the raw material inventories included an amount of $44,478.13 which was not paid for materials. This amount was paid to American Carbon Paper Corporation but not for materials purchased. American Carbon Paper Corporation retained ⅛th of the amount and remitted ⅝ths thereof to Jersey Coast Sales Company, a partnership,

the amount being treated as commissions on sales. We understand the partners in Jersey Coast Sales Company to be R. A. Blauner and Karen Taylor. We are advised that American Carbon Paper Corporation reported the payments to Jersey Coast Sales Company on a Form 1099, filed last January. We have been informed by Mr. R. A. Blauner that the amounts received by him and by Karen Taylor from Jersey Coast Sales Company were reported in the income tax return filed for that partnership.

"2. The expenses claimed in the 1950 return include three items, being monies accrued by us to W. J. Sims totaling $40,226.45. This amount of $40,226.45 included the sum of $22,500.00, which was actually disbursed by American Lithofold Corporation in 1950, the remainder being accrued in 1950, but not disbursed until 1951. The $22,500.00 included $3,000.00 paid to Mr. Sims as commission on paper purchases. We now are advised that the amounts paid to Mr. Sims by us were remitted by him to J-R Supply Company, a partnership consisting of Mr. Sims and Mr. R. A. Blauner, and we are told was ultimately disbursed to:

"R. A. Blauner ....................... $10,912.00
"W. J. Sims ......................... 10,252.00
"Geraldine Mulhollen ............... 1,086.00

"American Lithofold Corporation filed last January an information report on Form 1099 for the account of W. J. Sims in the amount of $28,-450.00. This amount is accounted for as follows:

"Salary paid W. J. Sims ............ $5,700.00
"Commission for special services included in Charlotte office selling expenses ...................... 250.00
"Amounts reported above ........... 22,500.00

"We are making these disclosures voluntarily. We shall be glad to furnish any additional information you may desire, and will cooperate fully

in any investigation you may wish to make.

"Yours very truly,
"American Lithofold Corporation
"/s/ R. J. Blauner
"RJB:leb R. J. Blauner, President-Treasurer.
"cc: Mr. Rudolph H. Hartmann,
"Senior Special Agent St. Louis Office,
"Intelligence Division,
"Rm. 428, Old Custom House,
"8th & Olive Street,
"St. Louis, Mo.
"Mr. M. B. Eshleman,
"Internal Revenue Agent in Charge,
"Railway Exchange Bldg.,
"St. Louis, Mo."

It should be noted here that the above letter made voluntary disclosures and had specific reference to Lithofold's income tax return for the year 1950 only.

Following the withdrawal of Price Waterhouse, Ernst & Ernst, another accounting firm, was employed to make an audit of Lithofold's books and to prepare its income tax return for the year 1951. Such tax return as prepared by Ernst & Ernst did not indicate all the recipients of moneys paid out. It did not disclose the payments to R. A. Blauner. The tax return as prepared and filed did not disclose excess payments to American Carbon on paper purchases nor that ⅚ths of the excess amount went to R. A. Blauner under the guise of Jersey Coast Sales. Such expenditure was, instead, disguised as cost and hidden in "purchases for the year" and, of course, no tax reported or paid thereon. The tax return further did not show R. A. Blauner as the recipient of one-half the commissions ostensibly paid to W. J. Sims on government contracts and deducted as business expense.

To Lithofold's 1951 income tax return prepared by Ernst & Ernst there was attached an auditor's statement which included the following:

"* * * This return was prepared generally without independent determination of the deductibility of certain costs and expenses, and the accountants' exceptions set forth in the accountants' report are incorporated herein by reference as fully as if written herein and made a part hereof."

In the accountants' report, Plaintiffs' Exhibit 32, copy of which was not attached to the income tax return, there was included the following statement:

"During the course of our examination, we noted that the corporation purchased from American Carbon Paper Corporation the carbon paper required for certain orders at prices in excess of those paid on other orders; such excess prices amounted in the aggregate to approximately $102,000.00. We were informed that approximately $85,000.00 of the above amount was remitted by American Carbon Paper Corporation to Jersey Coast Sales Company in which Robert A. Blauner is a partner."

It further stated:

"Commission expense includes amounts paid to certain individuals who were not credited with any specified sales on the company's sales records. Selling and general and administrative expenses include amounts which we are not yet able to pass upon as being ordinary and necessary to the successful conduct of the business and providing for taxes and income the above items have been treated as deductions from taxable income and similar items were deducted from taxable income in federal income tax returns of prior years. We are not yet in a position to say that the items will be allowed as deductions by representatives of the Bureau of Internal Revenue and we therefore cannot pass upon the accrual for taxes and income."

The accountants' report contains a schedule entitled "Commissions Paid in Excess of $10,000.00". Included in the schedule are payments to R. A. Blauner

in the sum of $37,166.66. Commissions paid to W. J. Sims are given as $141,495.-35, to which there is a footnote as follows:

"We were informed that the amount listed as paid to W. J. Sims was actually received by the J-R Supply Co., of which Robert A. Blauner is a partner, and that approximately 50 per cent of the amount received by the partnership was disbursed to Robert A. Blauner."

When Ernst & Ernst were originally employed, they were informed by Attorney Green about the arrangement to pay an excess price for paper purchased from American Carbon. Baker, a partner of Ernst & Ernst, testified that "we inquired into that quite at length, and the best answer we got on it was that this was in connection with government work and initially they had felt that this had to be paid in order to obtain that particular government work."

While appellant consistently explained that the excess payments were to take care of commissions to get government contracts and that his reason for doing so in the manner indicated was because of restrictions on a Reconstruction Finance Corporation loan held by Lithofold, nevertheless the payments were continued after the RFC loan had terminated. R. J. Blauner instructed Stanhope, who inquired why, "We have set that arrangement up and we will continue it."

In addition to the improper payment of excess costs to R. A. Blauner through American Carbon and Jersey Coast Sales and the covered up payments of commissions to R. A. Blauner through Sims and the J-R Supply Company, it was the government's further contention that there was a large over-statement of business expense deductions particularly with reference to the expense accounts of both the appellant and his son, R. A. Blauner. It is the government's claim that the appellant caused Lithofold to pay out large sums of money for himself and for his wife and son and to deduct these pay-

ments as business expenses, thereby understating Lithofold's net income and defeating tax thereon. Of the appellant's expense vouchers for 1951, which total $26,709.23, the government claims $9,-466.56 as not deductible. These included large expenditures while in Florida. An examination of them fully justifies the obvious conclusion of the jury that a substantial bulk of the objected-to items represent personal expenditures of the appellant and his wife. They include large amounts charged to Mrs. Blauner in a department store at Miami Beach. Mainly the items were expenditures during the months of February, March and April, 1951, including costs of taking care of guests, purchases to furnish a Fort Lauderdale home owned by American Carbon, including linens, sheets, etc. When asked why he charged the expenses of the operation of the home to Lithofold when the home was actually owned by American Carbon, appellant said that business promoted for either corporation resulted in business for both of them and that he apportioned the expense, that he couldn't afford the home himself and Lithofold couldn't afford it and American Carbon was more financially stable at that time and therefore it was purchased in the name of American Carbon. He claimed he purchased the home as a sales promotion idea. Appellant's expense accounts paid by Lithofold included such items as:

71 days supplies @ $20
(average because of
board, some let-up in
guests) ..............$1,420..

71 days extra help &
carfare $8.00 .......... 568..

Entertainment, cash for
dinners, taxi-cabs, etc.,
120 days @$20.00...... 2,400..

Other items included cameras, groceries, liquor, charges at various shops, cleaners' bills, gifts, flowers, their Chicago maid taken to Florida and the transportation and entertainment of persons on a purely social basis and having no connection with the business affairs of either Lithofold or American Carbon.

As to R. A. Blauner's expense vouchers for 1951, they totalled approximately $22,982.64. It was the government's position that all of such expenditures were disallowable as deductions excepting $3,-811.89. The jury had the right to view R. A. Blauner's expense accounts, particularly while in Cuba, in light of the fact that he went there in early 1951, that total sales there for Lithofold in 1951 could not have exceeded $348.50, and that his expense accounts obviously included items of a purely personal nature and that on the books of the company R. A. Blauner was receiving a monthly salary of $3,000 which during the year 1951 was raised to in excess of $4,000 per month.

It is the appellant's first contention that the evidence was wholly insufficient for the jury to find that appellant "filed" or "caused to be filed" the 1951 income tax return of American Lithofold Corporation. Appellant claims that there is no direct proof as to who filed or caused to be filed the income tax return in question. He points out that the evidence at best is circumstantial and that in order for it to be sufficient for a finding that the appellant "filed or caused to be filed" the tax return, such circumstantial evidence would not only have to be consistent with the hypothesis that appellant did in fact file the return or caused it to be filed but would have to be inconsistent with every reasonable hypothesis that someone else filed that return or caused it to be filed. As we have observed, the only way the jury had the appellant's side of the story was through his statements made prior to trial to the government's investigators and to others. Most of that is referred to supra. At the time in question the appellant was the president, treasurer and active manager of Lithofold and admitted that he was in a general way responsible for the tax return in question. He was the one who had admittedly devised the method of paying American Carbon excess charges for carbon paper which in the year in question, 1951, totalled $101,-621.43, most of which found its way into the pockets of his son and which, under the method devised by the appellant, appeared on the books of the corporation and its income tax return as cost of carbon paper. Appellant participated in the surreptitious siphoning of excess commissions to his son through Sims and the J-R Supply Company. He even complained to Sims when one commission check was not split up promptly enough. All of the circumstances are such that the appellant appears as the dominant figure in Lithofold and in American Carbon as well. He devised the schemes and he gave the orders. That his name was not signed to the 1951 income tax return, that the evidence does not show that he physically filed the income tax return is immaterial. It is entirely reasonable that the jury should conclude, as they very apparently did, that appellant was responsible for the 1951 income tax return, the errors it contained, and that he "caused it to be filed".

Appellant rests his contention mainly upon the authority of Vloutis v. United States, 5 Cir., 1955, 219 F.2d 782, rehearing denied April 15, 1955, and Benham v. United States, 5 Cir., 1954, 215 F.2d 472. Neither justifies appellant's reliance. In Vloutis appellant and his wife filed separate returns on the community property basis. Appellant was an elderly man who could read and write only with difficulty, if at all. He had partnership interests in two establishments. The court pointed out, in 219 F.2d at page 785:

"Appellant apparently had little or nothing to do with the internal operation of the Old Gem and was present at the establishment rarely, if at all, during its business hours. One of the Government witnesses testified it was his understanding and observation that appellant was only a 'floor man' at the Kit Kat and apparently had little to do with the financial operations of the business. One Koningh was the bookkeeper for both businesses, and prepared the partnership as well as the individual tax returns for the partners. There is nothing in the record to show that appellant had anything to do with the preparation and keeping of the

records of either business, and he presumably relied entirely upon the bookkeeper. He and his wife filed separate returns on the community property basis."

After finding that there was no evidence to connect him with the *filing* of his wife's return, the court stated, in 219 F.2d at page 790:

" * * * There is evidence to the effect that appellant's bookkeeper prepared the returns from the information furnished by appellant and from the books kept by the two partnerships; and, to that extent, such evidence shows appellant participated in or 'caused' the *preparation* of his wife's return. However, we think this point is controlled by our decision in Benham v. United States, 5 Cir., 215 F.2d 472, 473 * * *."

Benham also involved separate returns by husband and wife and therein one of the charges was that the appellant filed or caused to be filed a false tax return on behalf of his wife. The court therein stated, in 215 F.2d at page 473:

" * * * While the returns show on their face that the joint community income of the husband and wife was determined and divided in half for tax purposes, that fact alone does not suffice to establish that the husband either filed or caused to be filed the wife's separate return. That return was not signed by the husband, but was signed by the wife and by the accountant who prepared it, and the evidence is entirely consistent with the theory that they were the only ones responsible for its filing. The husband's erroneous records may have accounted for the errors in the wife's return, but the crime was not complete until the return was filed, and to be guilty under the fourth count the husband must either have filed his wife's return or have caused it to be filed. There is no evidence that he did either."

That is not at all our situation here. In this case we are dealing with the tax return of a corporation of which the appellant was president, treasurer and general manager and for whose tax return he admitted general responsibility. In United States v. Albanese, 2 Cir., 1955, 224 F.2d 879, 882, certiorari denied, 350 U.S. 845, 76 S.Ct. 87, 100 L.Ed. 753, the court stated:

"It is of no import that Albanese did not personally sign any of the returns filed in his name. Both direct and circumstantial evidence, viewed favorably to the government, show that he caused the false returns to be filed."

The Second Circuit had a related question before it again in United States v. Allied Stevedoring Corp., 2 Cir., 1957, 241 F.2d 925, 930, certiorari denied, 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143, wherein Judge Learned Hand said:

"The indictment charged an 'attempt to defeat and evade a large part of the taxes due and owing' from 'Allied' 'by filing and causing to be filed * * * a false and fraudulent tax return.' Apparently the argument is that it was a fatal variance as to Potter and Bowers because they were not shown to have had any part in the actual filing of the return. We are not clear that the Fifth Circuit in Vloutis v. United States, 5 Cir., 219 F.2d 782, 790, meant so to hold; but, if so, we cannot understand why § 2 of Title 18 U.S.C. does not cover the occasion, for, if Ward filed a fraudulent return, it is not possible that he did so on his own, or that the other two did not 'aid' and 'abet' him; and, if so, they were 'principals.' Our decision in United States v. Albanese, 2 Cir., 224 F.2d 879, is not reconcilable with any other theory; and this was likewise the ruling in Imholte v. United States, 8 Cir., 226 F.2d 585, 589."

Judge Collet, speaking for this court in Imholte v. United States, 8 Cir., 1955,

226 F.2d 585, 588, rehearing denied December 5, 1955, said:

"* * * The statute is drawn in broad general terms. The willful attempt to evade or defeat any tax *in any manner* is the offense defined. The offense may be committed in any manner so long as there is a willful attempt to evade the tax. It may or may not be committed by the filing of a false or fraudulent return coupled with conduct which brings it within § 145(b). See United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546. Hence that part of the indictment which refers to the filing of a false and fraudulent return is merely a specification of definiteness and certainty for the defendant's information, incorporated in the indictment originally rather than upon the subsequent order of the court in response to a motion for bill of particulars or to make more definite and certain. The fact that the great majority of such unlawful attempts to evade taxes include the act of filing a false return and that it has become customary to state such fact in the indictment does not change the offense under § 145(b), 26 U.S.C.A., from an attempt to evade, to the offense of filing a false return."

Appellant's second contention with reference to insufficiency is his claim that there was a failure to establish that there existed any willful and knowing attempt on his part to defeat taxes due or that he conspired to do so. It is asserted:

"To say that the evidence established willfulness, knowledge of falseness and deceit on the part of appellant would be to substitute speculation for proof, and to presume guilt rather than innocence."

It is pointed out that Lithofold's books were prepared and kept under the supervision and control of Stanhope, with the assistance of various other employees. Great reliance is placed on the fact that the tax return was prepared by Ernst & Ernst, a nationally known accounting firm; that it was prepared from an Ernst & Ernst audit and presumably then mailed to the corporation; that while a copy of the audit was not attached to and filed with the tax return, the auditor who prepared the return incorporated it by reference, and that the audit did give information with reference to excess prices paid American Carbon for paper in the amount of approximately $102,-000 for 1951, and that of that amount approximately $85,000 was remitted by American Carbon to Jersey Coast Sales, in which company R. A. Blauner was a partner.

While prosecution for the filing of the tax return for 1950 was prevented through expiration of the six-year statute of limitations, the evidence indicated, and this goes to the question of intent, that the same scheme as to excess payments to American Carbon by Lithofold was in operation and that this appellant was the originator of the scheme. It was set in operation under his direction. When auditors for Price Waterhouse, who had audited Lithofold's accounts for a number of years, discovered in mid 1951 after the filing of the 1950 return that Lithofold was paying excessive amounts for carbon paper to American Carbon and that such excessive amounts were ultimately finding their way into the pockets of R. A. Blauner, the appellant's son, they requested a meeting. At such meeting, or meetings, the scheme was disclosed. The accountant, Jackson, had made a draft of his report. The appellant felt that undue emphasis was being placed in the report on this particular matter. The testimony justifies the conclusion that the appellant also attempted to get Jackson to take out of the report any statement with reference to the excess payments, but that he was told by Jackson that because of the relationship between the companies a statement had to be made. Even after the reluctantly written letter of December 7, 1951, to the Collector of Internal Revenue regarding the so-called voluntary disclosures as to the 1950 tax return, appellant nevertheless continued the

same type of misleading operations. He could only have done this knowingly and intentionally for he was warned by his own counsel that the concealment of the payments to R. A. Blauner might lead to fraud charges. The jury could well have found that the scheme was merely one to siphon off earnings of Lithofold to R. A. Blauner, thus avoiding tax thereon by Lithofold. Once the scheme was evolved and put into operation, the falsity of the return follows. Appellant admittedly was aware of the fact that his son was the ultimate recipient of the excess amounts being paid to Jersey Coast Sales for he set the scheme up. He also was aware of the fact that his son and Sims had an alleged partnership whereby the appellant's son received large amounts of commissions not disclosed by the books of Lithofold. The jury could well conclude that the appellant's conduct was such as would mislead and would conceal large profits being paid to R. A. Blauner. Mr. Justice Jackson, speaking for the Supreme Court in Spies v. United States, 1943, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418, said:

> " * * * By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, *making false entries* or alterations, *or false invoices or documents*, destruction of books or records, concealment of assets or covering up sources of income, *handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.* If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime." (Emphasis supplied.)

Appellant's reliance upon the employment of Ernst & Ernst and what is referred to as the latter's incorporation of its audit by reference is no shield. The statement or declaration attached to the income tax return executed by the auditor is little more than a disclaimer of responsibility for anything that might be wrong if something wrong were found. It is just a refusal to be charged with determination of the propriety of deducted items. Significantly, a copy of the audit was not attached to the return, although reference was made to it. Here, again, may be an indication of an attempt to mislead and to conceal by failing to include copy of the audit with the return.

While it is possible that reasonable minds might differ, we believe that the jury had before it substantial evidence from which it could conclude that the appellant willfully and knowingly conspired to defraud the United States of income tax due and owing by Lithofold for the year 1951, that he knew what he was doing all the way along, that he continued such operations in spite of warnings from his auditors and from his attorney. Conspiracy is difficult of proof. Persons who conspire unlawfully do not broadcast their intentions or write them out. Only by their words and by their actions can their intentions be ascertained. If the excess payments by Lithofold to American Carbon were for any other than an illegitimate purpose, it is not apparent. Appellant's specious excuse that the arrangement was made to avoid restrictions contained in a loan agreement between Lithofold and the Reconstruction Finance Corporation could conceivably have been accepted by the jury as truthful. Nevertheless, after RFC had been repaid by Lithofold the excess payments to American Carbon were continued, because appellant "didn't want people to think that they thought there was anything wrong in the payments." We are forced to hold here, as we do, that the evidence, viewed in the light most favorable to sustaining the jury verdict, was sufficiently substantial to justify the jury's conclusions that the appellant knowingly and willfully caused the false and fraudulent income tax return to be filed, that he did so with the intention of defrauding the government, and that he

willfully and intentionally entered into a conspiracy to achieve that purpose.

■■■ In addition to the evidence with reference to excess payments to American Carbon and commissions paid surreptitiously to R. A. Blauner through Sims and J-R Supply Company, the jury had before it the government's contention and evidence thereon that there was an overstatement of business expense deductions made for the purpose of defeating a tax due and owing by Lithofold. We think that under such evidence the jury could well have found that both expense accounts of R. J. and R. A. Blauner were heavily loaded with items having nothing whatsoever to do with the business of American Lithofold and that the jury could, as they obviously did, infer knowledge, intent and willfulness to evade tax by charging as business deductions purely personal expenses and having them paid by Lithofold. Additionally, the jury could have found under the evidence that transportation and other expense having no relationship to the business of Lithofold but nevertheless charged to the corporation constituted an attempt to evade Lithofold's taxes. The situation is similar to that confronting the court in Lash v. United States, 1 Cir., 1955, 221 F.2d 237, 239, rehearing denied May 2, 1955, certiorari denied, 350 U.S. 826, 76 S.Ct. 55, 100 L.Ed. 738, wherein the defendant there caused items of his and his family's purely personal expenses to be paid by the corporation and deducted by it as expense of doing business. A jury's verdict of guilty therein was affirmed by the Court of Appeals.

■■■ Appellant's second main contention is that the trial court erred in permitting government counsel, over the objection of the appellant, to read to the jury during his opening statement Count 3 of the indictment, that being the conspiracy count, together with the overt acts alleged therein, and that the trial court additionally erred during the course of its charge to the jury by also reading the indictment, including the overt acts alleged in the conspiracy count. In the first place, the jury was very definitely and forcefully instructed that the indictment constituted no evidence of any character in the case against the defendants, that it did not even raise a suspicion of guilt, and that the jurors were not to consider it when they retired to the jury room as containing or constituting any evidence whatsoever of guilt against either of the defendants, that an indictment is merely the physical means by which a defendant is brought to trial and that its sole function is to identify the offense with which the defendants are charged, and that was the only use the jurors were to make of it.

As to the conspiracy count and the overt acts, the trial court charged the jury:

"You will recall that under Count 3 of the indictment it is alleged that sixteen separate overt acts were committed by one or more of the defendants. They consist of such acts as filing and causing to be filed with the Collector of Internal Revenue at St. Louis, Missouri, a false and fraudulent corporate income tax return for the American Lithofold Corporation for the year 1951; the filing of Form 1065, a return of income for the Jersey Coast Sales, with the Collector of Internal Revenue at Newark, New Jersey; the entertainment of various parties in Florida not invited for business reasons, but taking a deduction therefor as expenses on the 1951 income tax return of American Lithofold Corporation during the year 1951.

"It is not necessary for the prosecution to prove each of the sixteen overt acts. *Indeed, the prosecution does not contend that more than six of them have been proven.* The conspiracy offense is complete if any one of these overt acts were committed as alleged in the indictment by one of the conspirators, and in that event it is complete as to any and every person found by you to be a member of the conspiracy at the time the overt act was committed, regardless

of which of the conspirators did the overt act." (Emphasis supplied.)

While certainly the reading to the jury of the entire indictment, including some ten overt acts which the prosecution did not contend had been proven, is not an approved or recommended practice and may be error under some circumstances, we nevertheless find that in the setting in which it occurred, and in considering the court's charge as a whole and particularly those references heretofore made, that the jury was not misled or confused and the appellant not prejudiced by the reference to the overt acts which the government did not and could not establish. Holdridge v. United States, 8 Cir., 1960, 282 F.2d 302, 311–312. Rule 52, Federal Rules Criminal Procedure, Title 18 U.S. C.A. We find no reversible error therein.

■ Appellant's next contention is based on the trial court's refusal to grant his motion for a mistrial predicated upon improper argument of government counsel. During the closing argument, government counsel stated to the jury:

"Ladies and gentlemen, it is not a question here of designation; it isn't a question of whether this should be costs of goods sold or commissions. It shouldn't be either. It should be corporate taxable income. This money was not spent by the corporation for any business purposes. This money was paid out as income to R. A. Blauner, to the members of the family, the family got it, or if it was used, if it was used to bribe a government official, the government should know about—"

Objection was promptly made and promptly sustained and the jurors instructed to disregard the statement. Upon the making of a motion that the jury be discharged and a mistrial declared, the court stated:

"Be overruled, but the jury understand that the statement is stricken. There's not one scintilla of evidence to support such a statement, it's completely outside of the record, and if you get outside of it again, I will

seriously consider such a motion, but you in deliberating on this case will ignore the statement."

The trial court's prompt sustaining of the objection, his admonition to the jury that the statement was stricken and should be disregarded, that there was not one scintilla of evidence to support it and his stern admonition to government counsel did, in our opinion, eliminate any harm which might have resulted from government counsel's outside-the-record remark. The trial judge, one of long experience in jury trials, was alert and prompt in his statements. Furthermore, he saw the jurors. He had been working with them for many days. It obviously was his considered judgment that the improper statement would be disregarded by the jury. In so concluding, we believe that he properly exercised that broad discretion which rests on the shoulders of the trial judge to determine if, when and how much an improper remark may create prejudice.

■ Appellant's last contention is that the trial court erred in refusing to give and read to the jury his requested instruction No. 14 as follows:

"In considering the income tax return filed for American Lithofold Corporation for the calendar year 1951, you should take into consideration the accountants' exceptions set forth in the accountants' report of audit prepared by the accounting firm of Ernst & Ernst for said corporation for such year which were incorporated in said tax return by reference as fully as if written in said return and made a part thereof."

The tax return and the accountants' report of audit, which appellant did not attach to Lithofold's tax return, were both in evidence and both had been called to the attention of the jury. The making of the audit and the accountants' exceptions as set forth in his report of audit were the subject of testimony by the witnesses and were discussed by both counsel in arguing to the jury. Defense counsel pointed the matter out to the jury and

even read portions of the return which recited the incorporation of the accountants' report by reference. The jury had all of the exhibits available to them. The request was merely one which sought to have the trial court single out and emphasize a piece of evidence which appellant thought favorable to him.

We have considered the trial court's charge in its entirety and we find no error whatsoever in refusal to give defendants' requested instruction No. 14.

It seems obvious to us, from a complete reading of the voluminous transcript herein and full consideration of the appellant's contentions, that the appellant had a fair trial, that no errors of prejudicial nature were committed, and that the jury's verdicts are based upon substantial testimony.

Affirmed.