Frank VLOUTIS, Appellant,

v.

UNITED STATES of America, Appellee.

No. 14975.

United States Court of Appeals, Fifth Circuit.

March 2, 1955.

Rehearing Denied April 15, 1955.

---

**784**

Douglas W. McGregor, Houston, Tex., Robert Weinstein, Philip D. Rittenberg, Fred Bronfin, Henry F. Yoder, New Orleans, La., for appellant. Rittenberg, Weinstein & Bronfin, Albert Mintz, New Orleans, La., of counsel.

George R. Blue, U. S. Atty., M. Hepburn Many, G. Harrison Scott, Asst. U. S. Attys., New Orleans, La., for appellee.

Before HUTCHESON, Chief Judge, BORAH, Circuit Judge, and DAWKINS, District Judge.

DAWKINS, District Judge.

This is an appeal from a conviction, fine and sentence to twelve months' imprisonment on each of four counts charging appellant with willful evasion of income taxes for the years 1944 and 1945 under Section 145(b) of the Internal Revenue Code, 26 U.S.C.A. § 145(b). The United States undertook to prove its case by the use of the net worth method. Many of the issues raised here were discussed in one or more of the four decisions recently handed down by the Supreme Court[1] wherein it laid down the broad principles governing the trial and review of cases based upon that theory. In Holland, after the Court had pointed out the dangers inherent in this method of proving a crime, it was said:

"While we cannot say that these pitfalls inherent in the net worth

1. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127; Friedberg v. United States, 348 U.S. 142, 75 S.Ct. 138; Smith v. United States, 348 U.S. 147, 75 S.Ct. 194; and United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186.

method foreclose its use, they do require the exercise of great care and restraint. The complexity of the problem is such that it cannot be met merely by the application of general rules. Cf. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 489, 71 S.Ct. 456, 465, 95 L.Ed. 456. Trial courts should approach these cases in the full realization that the taxpayer may be ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute. Charges should be especially clear, including, in addition to the formal instructions, a summary of the nature of the net worth method, the assumptions on which it rests, and the inferences available both for and against the accused. Appellate courts should review the cases, bearing constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation." 348 U.S. 129, 75 S.Ct. 132.

It is with this admonition in mind that we approach the present appeal.

In order to focus the issues in their proper perspective, it is necessary to relate certain background facts, taken primarily from the testimony of one of the Internal Revenue agents. Appellant is an elderly man who reads and writes with difficulty, if at all. For many years he has been in the bar and restaurant business in one form or another in the City of New Orleans. During the time with which the Government's evidence was concerned, appellant was a partner in the Old Gem and the Kit Kat restaurants. He and one Spahos were equally interested in the Kit Kat. In the Old Gem partnership, one Baffes owned fifty percent, while appellant and Spahos each owned twenty-five percent. In 1945 appellant's interest in the Old Gem was increased to twenty-eight and one-half percent and that of Spahos was reduced to twenty-one and one-half percent; and appellant acquired an additional three percent interest in the Kit Kat from Spahos.

Appellant apparently had little or nothing to do with the internal operation of the Old Gem and was present at the establishment rarely, if at all, during its business hours. One of the Government witnesses testified it was his understanding and observation that appellant was only a "floor man" at the Kit Kat and apparently had little to do with the financial operations of the business. One Koningh was the bookkeeper for both businesses, and prepared the partnership as well as the individual tax returns for the partners. There is nothing in the record to show that appellant had anything to do with the preparation and keeping of the records of either business, and he presumably relied entirely upon the bookkeeper. He and his wife filed separate returns on the community property basis.

In June 1946 an Internal Revenue agent and an investigator for the Intelligence Unit called upon the bookkeeper for the stated purpose of checking the tax records of the two businesses. They were given "100% cooperation" by the bookkeeper and by the partners, with full and complete access to all of the records of both businesses. After a preliminary check of these records, during which they discovered certain discrepancies between the day-book record of receipts and the journal to which day-book entries were posted, they undertook an investigation for the purpose of discovering the assets owned by the three partners. It is indicated by the testimony of the agents that the partners were not informed of this phase of the investigation. On July 29, 1946, the two investigators had appellant and his bookkeeper appear at the office of the Bureau, placed appellant under oath and propounded 117 questions concerning his financial affairs, all of which appellant attempted to answer in full cooperation with the investigators.

There followed another period of outside investigation and on August 16, ap-

786

pellant was again put under oath and asked 131 questions, one of which was: "How much, Mr. Vloutis, was your net worth at December 31, *1941?* Try to reflect and give me a figure as nearly as you think?" (Emphasis supplied.) Appellant's immediate response was: "I don't recall, I don't remember." Later, in response to another such question, he said, "I must have had about $40,000 or $50,000 at that time." Thereafter, in their questioning, the agents more or less assumed that appellant had bound himself to $40,000 cash on hand as of that date.

On the basis of the work of these two investigators, appellant's prior tax returns and his two unsigned statements, the Government prepared a net worth statement for appellant as of December 31, 1941, through 1945. This statement showed annual increases in net worth (as calculated therein) well in excess of the income reported in 1944 and 1945. The indictment, trial and conviction followed.

Neither of the other partners was indicted, nor was the bookkeeper. The latter was used as a witness for the Government solely for the purpose of identifying certain documents introduced into evidence; and his cross-examination was restricted upon objection by the Government to matters relating only to the documents he identified—the theory being that "he is not the Government's witness." At this point, it may be observed that throughout the trial, the judge allowed the Government rather wide latitude in its order of proof and in the substance of its evidence, notwithstanding frequent and vigorous objections by appellant.

Appellant assigns fifteen specifications of error; but the view we take makes consideration of some unnecessary. The crucial specifications are condensed and stated as follows: (1) the erroneous use of the net worth theory when there was no showing that the partnership

books and records were inadequate or false; (2) the inadmissibility or incompetency of certain evidence introduced by the Government to prove appellant's net worth; (3) the insufficiency of the evidence to substantiate the Government's calculation of appellant's net worth; (4) the erroneous and incomplete charge to the jury, especially as to intent, and the insufficiency of the evidence to prove intent; and (5) complaints arising from some special charges given and others refused. These errors were all raised by timely objections, by motions for acquittal and by an alternative motion for new trial.

I.

█ The record shows that in their investigation prior to the indictment, the revenue agents discovered certain errors or inconsistencies in the books of the two partnerships, which were apparently corrected upon request. During the trial these facts were revealed by Government witnesses; but on the whole, there was no evidence specifically showing material false or inadequate entries in the books. Relying upon Section 41 of the Internal Revenue Code, 26 U.S.C.A. § 41, and expressions in cases cited,[2] appellant contends that such a showing is a condition precedent to the use of the net worth theory.

The Supreme Court, however, has resolved the precise question against this contention. In Holland, supra, it was held that Section 41 relates only to the method of accounting used by the taxpayer in his records and could not properly be construed to require proof of false or inadequate bookkeeping as a foundation for the use of the net worth theory. The Court said:

"To protect the revenue from those who do not 'render true accounts', the Government must be free to use all legal evidence available to it in determining whether the story told by the taxpayer's books

2. Among such cases are Bryan v. Commissioner, 5 Cir., 209 F.2d 822, and Sasser v. United States, 5 Cir., 208 F.2d 535.

accurately reflects his financial history." 348 U.S. 132, 75 S.Ct. 134.

Whatever may have been the ruling of lower courts in previous cases involving this question, we are bound by the latest decision of the Supreme Court and must hold that there is no merit in appellant's contention.

## II.

For the purpose of organizing this opinion, several separately argued questions have been condensed into the second specification stated above. Since they all relate to the admissibility or competency of certain evidence, they will be discussed consecutively.

We have previously mentioned the two "question and answer" statements taken from appellant during the investigation. Although these statements were never signed by appellant, they were properly authenticated by a revenue agent who was present at the interviews and by the stenographer who recorded them. There was considerable discussion between counsel and the court during the trial over whether or not there had been discussions at the interviews which were not recorded by the stenographer; but appellant has abandoned any contentions he might have had in that connection. He does, however, assign two errors concerning these statements.

First, he argues that neither the statements nor the records which were obtained directly from appellant were admissible because he was not warned in advance that a criminal prosecution was imminent. He makes the same contention against the entire testimony of one of the investigating agents (Vivian) for the reason that his testimony was based upon information obtained from appellant's disclosures and records without advice of the latter's constitutional rights against self-incrimination.

Appellant admits, as he must under the evidence, that he was advised of his rights when the two formal statements were taken. However, he points out that the investigations were nearly complete at that time and that he, his partners and the bookkeeper had all "cooperated" fully before the warning was given. Since the evidence shows that this investigation was *begun and conducted* by agents from the fraud section of the Collector's office and from the Intelligence Unit, appellant argues that it was carried on from the beginning with the ultimate purpose of prosecution and he was, *in effect enticed into providing evidence against himself in ignorance of his rights.*

No doubt, the taxpayer who is called upon to assist revenue agents in an investigation or audit of his income accounting is placed in a very difficult, if not impossible, position—especially when a suspicion of fraud or evasion prompts the investigation. The taxpayer has the legal duty to keep records and file returns, and the Government has the right and the duty to check those records and returns. If he refuses to cooperate and remains silent, the taxpayer runs the risk of having incorrect inferences drawn from whatever facts the agents discover; and his attitude certainly does not lessen the suspicion. On the other hand, if he cooperates and converses freely with skilled investigators, he may be, and usually is, furnishing evidence for use against himself in a subsequent criminal prosecution. However, this is not to say that there is upon the Government an affirmative duty to warn a taxpayer at the beginning of an investigation, the breach of which would render inadmissible any evidence so obtained. In Montgomery v. United States, 203 F.2d 887, 893, we held that such evidence was admissible even where the agents specifically told the taxpayer they were making a routine check in a purely civil matter. We said:

"We do not think the circumstances under which the statements of the defendant and of his wife, and the cancelled checks and documents, were obtained were sufficient of themselves to require that that evidence be excluded on the ground of being involuntary as a matter of

law, or to require that the Government's Exhibit No. 20 based in part upon such testimony be not admitted in evidence. All of those circumstances were matters which went to the weight or credibility of the testimony thus obtained."

See also Smith v. United States, supra, note 1; and Sasser v. United States, supra, note 2.

The other contention against the admissibility of appellant's statements is based upon the argument that there was no independent evidence establishing the *corpus delicti*. It therefore raises a question as to the sufficiency of the evidence to corroborate portions of the statements and will be discussed later.

■■ Appellant also objected to the Government's evidence concerning his bank deposits, withdrawals and year-end balances for certain periods during the prosecution years and prior thereto. His argument is that such evidence was inadmissible because it was an attempt to use "the bank deposit theory" which cannot be employed in a prosecution based upon the net worth theory. The principal contention here is that the Government had previously stated it could not produce evidence of other sources of income than the two partnerships in which appellant was interested, and that it attempted to imply other sources by resorting to bank deposits as proof of income greater than that reported. We are convinced that the Government here was not attempting to use two separate theories for the calculation of appellant's actual income. Most of the references to bank transactions and balances during the period covered by the net worth computations properly formed a part of the Government's proof in attempting to build up and substantiate its calculations, or to indicate certain discrepancies in the books of one of the businesses. We find nothing improper in the admission of such evidence where it clearly relates to and forms a part of the factual ingredients of the Government's case and has probative value; indeed, the proper revelation of appellant's financial history and the computation of his worth required that all financial transactions be checked, including banking transactions. However, some of the Government's evidence had no relation to this permissible inquiry. By two witnesses, whose testimony on the subject covers several pages in the record, the Government disclosed the year-end balances of appellant's (and his wife's) bank accounts for each year all the way back to 1920. In argument, counsel seek to justify the admission of such evidence with the contention that the accounts were "analyzed" and presented to the jury for the purpose of showing available funds were slim during the period when appellant implied he was saving his store of cash. We cannot agree. In the first place, we are unable to perceive the probative value of bank records generally to disprove the accumulation of cash kept in outside places. More important, and dispositive of the issue, it is our opinion that the *year-end balance* of a bank account, standing alone, is a fact which has absolutely no necessary connection with the amount of money available, or even deposited during the year. When the Government used only that figure for the years prior to the prosecution period and when the balances for the consecutive years were announced at length in rapid succession, it forcefully presented to the jury meaningless evidence with the expressed purpose of impressing the jurors with the belief there was relatively little money available for accumulation. Such evidence was not admissible in that form and was clearly prejudicial to appellant.

Appellant further objected to the introduction of his income tax returns for the years 1942 and 1943 and of a Form 899, which was a compilation or summary of his tax history on file with the Collector. He argues that these documents are admissible only to attack the credibility of a taxpayer who takes the stand in his own defense, not to prove net worth. In addition, he contends that since Form 899 is only a summary of information contained in the returns of a taxpayer, it

should not have been admitted without supporting proof to establish what connection appellant had with the returns it purported to summarize.

■ Since one of the essential steps in establishing the beginning net worth of a taxpayer is to determine as nearly as possible the amount of undisclosed cash he may have had on hand, the courts have consistently allowed evidence of prior tax history as an element in the proof of the taxpayer's net worth. Holland v. United States, supra; Sasser v. United States, supra; Leeby v. United States, 8 Cir., 192 F.2d 331; Schuermann v. United States, 8 Cir., 174 F.2d 397. The very best evidence of prior tax history is the returns filed by the taxpayer himself. Appellant's objection to their use therefore was properly overruled.

■ The objection to Form 899, however, raises a more difficult problem. The agent who identified this form stated that all of appellant's original returns (other than those produced) had been destroyed. He related the procedure employed in the office of the Collector as follows: When a return is filed an index card is made of that return and assessment records are developed. Unless the returns are actively under investigation, they are destroyed; and later the index cards are microfilmed and disposed of. Microfilms running back to the year 1916 are kept permanently. In preparing the Form 899, an agent reviews the microfilm to determine the account number of the taxpayer's return. He then goes to the assessment records and determines what tax was assessed and the date. He prepares Form 899 as a summary of the years in which returns were filed and the amount of tax assessed for such years. The witness testified that this information was contained on the Forms 899 for appellant and his wife which were introduced in evidence.

In effect, then, the Government introduced a document which represents to the jury figures and information written down by a person other than the witness and taken from records which themselves were taken from the original return. While such evidence is not as free from doubt as would be the returns themselves, it appears that they are prepared from the official records in the Collector's office and pursuant to the regular order of business in that office. Manifestly, such a system was developed to solve the tremendous problem of handling the millions of returns filed each year and we think that the procedure used is sufficient to protect a defendant from any substantial danger of misrepresentation. While we have found no cases in which the use of Form 899 as such was mentioned, it appears that the courts have allowed agents testifying as witnesses to summarize their findings from records on file in the Collector's office. See Leeby v. United States, supra; and Schuermann v. United States, supra. Under the circumstances, we cannot say that the trial court abused his discretion in admitting the Forms 899 into evidence.

■ The last specification dealing with admissibility of evidence relates to the testimony of the Government witness Roussel, wherein he compared the profits of the two businesses in which appellant was interested. In response to direct questions, Roussel took the partnership returns filed for each business for the years 1942 through 1945 and made an "analysis". He stated only gross receipts and the reported net profit for each business for each year, and specifically called attention to the fact that in each year the gross receipts of the Kit Kat exceeded those of the Old Gem but that the Kit Kat reported less net profit than the Old Gem. Appellant vigorously objected that the testimony was irrelevant and prejudicial. The Government states here that the evidence was offered to show "the possibility or likelihood" that all of appellant's income was not being reported, and argues that this comparison was only an additional item of circumstantial evidence in its chain of proof which was properly admitted.

The Old Gem was primarily a saloon or lounge, but also had an oyster and

snack or short-order service. The Kit Kat was primarily a restaurant in which meals were served, although there was a bar and drinks were served in the dining room. Though they had some common characteristics and common partners, they were in reality different types of business. Before any comparison of their net profits could even approach significance, there would have to be detailed evidence that they had similar inventory requirements, similar overhead expenses, similar operating costs—in short, competent evidence to show that the percentage of net profit from gross receipts in each business should be approximately the same. Here there was only a comparison of *gross* receipts and *net* profits which was completely meaningless. The testimony was clearly irrelevant and was offered for the stated purpose of implying intentional understatement of the Kit Kat profits. In a net worth prosecution the evidence is almost wholly circumstantial, and the jury must necessarily draw inferences therefrom in order to reach any conclusion. To allow evidence which can support only a meaningless conclusion, such as the comparison allowed here, clearly prejudices the rights of the defendant.

### III.

■ Appellant's contentions as to the sufficiency of the evidence are raised by four specifications of error which were briefed and argued separately. He contends: (1) that there was not sufficient corroboration of his extrajudicial statements to prove the *corpus delicti;* (2) that since the offenses charged are based upon returns reported on the community property basis, the evidence is insufficient because it does not reveal the net worth of his wife; (3) that the testimony of the agent Roussel was made up almost entirely of the witness's conclusions not supported by evidentiary facts; (4) generally, that the facts proved by the Government and contained in appellant's statements do not support the net worth calculations made by the Government. In connection with the second point just listed, appellant argues that there is no proof whatsoever that he had anything to do with the returns filed by Mrs. Vloutis and he should have been acquitted on the two counts which charged him with "filing and causing to be filed" her returns.

Dealing first with the latter point, we find ourselves in agreement with the appellant—that there is no evidence to connect him with the *filing* of his wife's return. There is evidence to the effect that appellant's bookkeeper prepared the returns from the information furnished by appellant and from the books kept by the two partnerships; and, to that extent, such evidence shows appellant participated in or "caused" the *preparation* of his wife's return. However, we think this point is controlled by our decision in Benham v. United States, 215 F.2d 472, 473, where we said:

"While the returns show on their face that the joint community income of the husband and wife was determined and divided in half for tax purposes, that fact alone does not suffice to establish that the husband either filed or caused to be filed the wife's separate return. That return was not signed by the husband, but was signed by the wife and by the accountant who prepared it, and the evidence is entirely consistent with the theory that they were the only ones responsible for its filing. The husband's erroneous records may have accounted for the errors in the wife's return, but the crime was not complete until the return was filed, and to be guilty under the fourth count the husband must either have filed his wife's return or have caused it to be filed. There is no evidence that he did either."

Cf. Rubenstein v. United States, 10 Cir., 214 F.2d 667. Appellant's motions for acquittal should have been granted as to counts two and four.

The other contentions all relate to the sufficiency of the evidence to establish

the validity of the Government's net worth calculations and thereby to prove the offenses charged beyond a reasonable doubt. Though we have already found reversible error on other points, it is necessary to pass upon these questions in order to determine whether appellant is entitled to a new trial or acquittal. Of course, the calculations made in these cases are only as sound as the investigation is complete, because the method *assumes* that the annual increases in net worth are attributable to taxable income received during the year. If the taxpayer had had non-taxable income (from loans, gifts, bequests or tax-free interest, for example) with which he could have acquired the assets, the premise upon which the calculations are based falls; and the calculations are meaningless. Likewise, since the prosecution is limited to the specific period charged in the indictment, the foundation of the structure collapses if the taxpayer had on hand at the beginning of the period sufficient undisclosed funds to acquire the assets listed, whatever the source of those funds. Because the prosecution is *based* upon assumptions and is proved almost entirely by circumstantial evidence, the courts must closely study the evidence to see that the Government has been fair in its presentation of the evidence and to be certain that the jury would be justified in concluding the underlying assumption sound.

In doing so, we must bear in mind the dangers involved to the taxpayer, which are ably summarized by the Supreme Court in Holland; but we are also bound by the teachings of the decisions in Holland and the three companion cases which lay down the basic tests against which the Government's evidence is to be measured. The Government must prove every element of the crime beyond a reasonable doubt; but if it does so, the defendant "remains quiet at his peril." The Government must investigate all relevant leads furnished by the taxpayer which might explain his acquisition of assets; but it is not required to negate every possible source of non-taxable income. Any statements by the accused used in the prosecution must be corroborated; but corroboration may be found in "independent evidence to bolster the confession itself" or in independent evidence concerning the accused's conduct "during the prosecution period, which tends to establish the crime of tax evasion without resort to the net worth computations." Smith v. United States, supra [348 U.S. 147, 75 S.Ct. 199].

Here, according to the testimony of Government witnesses, investigators determined the amount of money appellant had reported as income in all the prior years by checking his tax history back to 1918. They checked the records of all banks and investment brokers in New Orleans and vicinity as well as the mortgage, conveyance and court records, for the purpose of determining all of the assets appellant and his wife had of record on December 31, 1943. They then took the two previously mentioned statements from appellant, who told them he had no money or property outside New Orleans. When appellant told them he must have had around $40,000 in cash on December 31, 1941, they went back to that date in making their calculations.

They found records showing savings and checking accounts in three banks, mortgage loans made by appellant to others in varying amounts, purchases of stocks and bonds, real estate transactions and life insurance purchases. The data produced by this investigation were then "analyzed" and a composite net worth statement was prepared, purporting to show appellant's net worth on December 31 of each year, 1941 through 1945. The statement showed no unrecorded cash at the beginning of any year, but listed as assets all bank balances (including appellant's virile share of the partnership balances), mortgage notes, appellant's portion of the partnership inventories, real estate and the cash surrender values of life insurance policies. No liabilities were shown except a reserve for depreciation. Annual increases in the net worth resulted, to which were added income taxes and life insurance premiums

paid, and from which were deducted nontaxable interest, increase in cash surrender value of insurance, increase in inventories and the standard deduction. The resulting figure was shown as the "corrected net income" which was substantially greater than "income reported".

Appellant's complaints against this evidence all relate to the failure of the Government to give him credit for any undisclosed cash on hand at the beginning of the prosecution period. While he has presented them separately and more elaborately, we interpret his arguments, in effect, to be: since there was no evidence to show any *separate* net worth of Mrs. Vloutis (or to negative its existence), and since the evidence clearly shows that there were leads furnished to the Government pointing to cash on hand at the beginning of the period, Roussel's testimony that there was and could have been no such cash was clearly an erroneous conclusion which invaded the province of the jury; therefore, there was not sufficient independent evidence to corroborate appellant's unsigned statement referring to $40,000 as of December 31, 1941; hence it follows that without the proper foundation of a substantiated beginning net worth, the Government's evidence does not prove the offenses charged beyond a reasonable doubt.

It is true that the Government agents did not interview Mrs. Vloutis, as they probably should have done to get a complete picture. However, the record shows that their investigation was conducted and data sought in the names of both appellant and his wife, none of which revealed any evidence of property owned by Mrs. Vloutis other than that included in the computation. Further, we think the summary of her tax history negatives the possibility of her having accumulated any substantial separate estate, especially when coupled with appellant's disclosures in his statement. He told the agents that he had access to no funds other than from his businesses, invest-

ments and safety deposit box; and he stated that not even his wife knew how much money was in the box. We think this evidence was sufficient to substantiate the refusal to include any other assets as to net worth of Mrs. Vloutis, and to require appellant to bring forth any evidence to the contrary, including his wife's testimony. See Ford v. United States, 5 Cir., 210 F.2d 313.

In attacking the testimony of the witness Roussel, appellant refers to the opinion of this Court in Demetree v. United States, 207 F.2d 892, wherein we discussed at some length the dangers involved in allowing such testimony; and we think that the instant case illustrates the type of situation described there. The background has been stated, but we should add here that the investigation upon which Roussel based his testimony was conducted primarily by agent Vivian from the Collector's office and agent Cooney from the Intelligence Unit. Cooney died prior to the trial; and although Vivian testified, he admitted facts to indicate he was somewhat inexperienced at the time he was working on the case and to show he had resigned about a year later to enter the insurance business. Roussel, who had not been involved in the investigation itself, testified as an "expert" who had either prepared or was explaining the technical bases for the net worth computations. Under vigorous cross examination, he admitted he did not know how much cash appellant had at the beginning of the prosecution period, but stated he had not shown any cash because he had no evidence to reveal any and didn't believe appellant had any. He went further to say that appellant had told the investigators of $40,000 cash as of December 31, 1941, and even if there had been such a fund, it would have been spent for the assets acquired up to December 31, 1943 (the beginning date). Appellant urges that it is upon these "conclusions" and his own statement about the $40,000 that the verdict must rest—that by ignoring other evidence and stating these "conclusions", Rous-

sel testified to the ultimate fact sought by the Government.

In Friedberg v. United States, supra, Note 1, the Supreme Court passed upon a point similarly stated and held that the statements by the witness were not conclusions, for the reason that the witness was "upon petitioner's insistence, was testifying to a negative fact: he had not included cash because he had found no evidence of cash. The evidence which he then summarized on redirect was only that which had already been introduced at the trial." 348 U.S. 145, 75 S.Ct. 140. Here, however, there is serious doubt that the point can be so easily resolved. It should be noted that the investigators never did ask appellant how much cash he had on December 31, *1943*. The Government's own evidence showed the following purchases or transactions by appellant: November 15, 1943, bonds in the amount of $5,571.26; December 14, 1943, bonds in the amount of $5,000.00; January 1, 1944 (*the very first day of the prosecution period*), bonds in the amount $5,610.92; January 10, 1944, loan to a friend of $3,000.00; during the month of January, 1944, United States bonds in the amount of $3,825.00; February 15, 1944, stock in the amount of $1,800.00; April 13, 1944, bonds in the amount of $6,152.30. The records of the investment company (which the Government examined) and the testimony of one of its brokers (whom the Government interviewed) showed that of the amounts listed, totaling $30,959.48, *at least $23,291.48, was paid in cash*. The investment broker further testified that in December, 1943, and again early in 1944, he went with appellant to the latter's bank box; that he saw therein several large brown envelopes; that appellant opened two envelopes on each occasion and extracted cash with which to buy stocks or bonds.

Certainly, then, there was evidence to indicate to the Government that appellant had *some* undisclosed cash on hand as of December 31, 1943. How much he had was, of course, a fact to which only he could testify; but in the face of such evidence as the Government uncovered in its investigation, we think portions of Roussell's testimony were impermissible conclusions which invaded the province of the jury.

This is not to say, however, that appellant should have been acquitted on counts one and three as a matter of law. On the contrary, we think there was sufficient evidence without the inadmissible portions of Roussel's testimony which, if believed, would support a conclusion that appellant materially understated his income during the prosecution period. Even though the evidence clearly shows there was some cash on hand at the beginning of the period, it was still for the jury to determine whether there was enough to account for the sizeable increases in net worth.

It is necessary to comment only briefly on the question of corroboration of appellant's statements. While we are doubtful that appellant intended to bind himself to the figure of $40,000 in his statements, or even that he understood himself to be so bound, we think there is sufficient independent evidence to constitute corroboration. Smith v. United States, supra; United States v. Calderon, supra. The circumstances under which the statements were taken, and the weight of the disclosures made therein were matters for the jury's consideration.

### IV.

The attack on the charge to the jury is centered around those portions thereof which related to the question of intent, and appellant complains chiefly about expressions which have been discussed and disapproved in previous cases. See Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418; Hartman v. United States, 8 Cir., 215 F.2d 386; Berkovitz v. United States, 5 Cir., 213 F.2d 468; Wardlaw v. United States, 5 Cir., 203 F.2d 884. Particular emphasis is placed upon remarks such as: " * * * If the defendant knew that he had enjoyed an income in excess of that reported and that he ought to pay the tax thereon, *obviously his failure so to do was willful*

and for an evil purpose, and the *purpose was evil in that he wanted to escape and evade a tax* which he knew he was obligated to pay." [3] (Emphasis supplied); and " * * * It would present a somewhat startling situation if the defendant, charged by law with the duty of filing a return, could sign and file a false return made to defraud the Government and escape punishment by disclaiming knowledge of that which he has sponsored. * * * he must be held to know that which it is his duty to know, and which he solemnly promulgated; * * *." [4]

While we are of the opinion that the charge as a whole was so worded as to lessen the effect of the quoted remarks, yet we are constrained to hold their inclusion to be error for the reasons discussed in the cited cases. We realize it is difficult to construct a sound charge on the question of intent in such cases as this, where the specific intent must be inferred from circumstantial evidence of conduct, for it must give the Government full benefit of all such evidence and at the same time make clear to the jury the distinction between filing a false return and the specific intent to evade tax. Still, that distinction must be made, as pointed out in Spies v. United States, supra; and the inclusion of unequivocal remarks which amount to presumptions against the taxpayer must be avoided. If the evidence discloses circumstances from which honest mistake can be inferred as well as willful evasion, the charge should be expressed in such a manner as to make it clear that the jury is free to determine the question of intent either way in the light of those circumstances. We think there were such circumstances here and that the quoted remarks were prejudicial to appellant's chances of having the jury conclude he was ignorant of any under-

statement and therefore free of the specific intent required.

However, we do think there was ample evidence to support the jury's contrary conclusion had the matter been submitted under proper instructions. They could have been unwilling to believe appellant was or could have been as ignorant of his financial affairs as he implied, and there was plenty of evidence from which the necessary intent could be inferred. Appellant was not entitled to acquittal on this ground.

Otherwise, we think the charge considered as a whole was sufficient properly to present all the issues to the jury. Nonetheless, in view of the dangers involved in this type of prosecution and the mandate previously quoted from the opinion of the Supreme Court in Holland, we are constrained to suggest, for the guidance of the trial court, that there should be included in the charge a more comprehensive and unified "summary of the nature of the net worth method, the assumptions on which it rests, and the inferences available both for and against the accused."

### V.

Appellant also contends that the trial judge improperly granted seven special charges requested by the Government and erroneously modified one charge requested by him. Without lengthy quotation, it is sufficient to state that while there is some repetition, we find no reversible error in the action attacked.

For the reasons assigned, the conviction is reversed and the matter is remanded, with instructions to grant appellant's motion for acquittal on counts two and four and his motion for a new trial on counts one and three.

Reversed and remanded.

---

3. This is similar to charges found to be erroneous in Wardlaw and Berkovitz, cited above.

4. This statement was contained in a special charge granted at the request of the Government, which was attempting to nullify appellant's implied defense that

he was not familiar with the financial affairs of the two partnerships and relied wholly upon his partners and the bookkeeper. It is therefore similar in meaning and effect to charges declared erroneous in Berkovitz and Hartman, cited above.