Marvin E. Hinson and Pauline Hinson v. Commissioner. Marvin E. Hinson v. Commissioner.
Hinson v. Commissioner
Docket Nos. 4108-64, 4109-64.
United States Tax Court
T.C. Memo 1967-15; 1967 Tax Ct. Memo LEXIS 247; 26 T.C.M. (CCH) 95; T.C.M. (RIA) 67015; January 30, 1967
*247 Held: Petitioners' substantial understatement of their adjusted gross income on their Federal income tax returns for 5 years was due to fraud with intent to evade tax. Robert B. Lloyd, Jr., and H. Thomas Greene, for the petitioners. Charles B. Sklar, for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion SIMPSON, Judge: In docket No. 4109-64, respondent determined a deficiency in Marvin E. Hinson's Federal income tax for the year 1956 in the amount of $2,728.45 and an addition to the tax pursuant to section 6653(b) of the Internal Revenue Code of *248 1954[1] in the amount of $1,364.22. In docket No. 4108-64, respondent determined deficiencies in Marvin E. Hinson's and Pauline Hinson's Federal income tax and additions to the tax pursuant to section 6653(b) as follows: Addition
Year
Deficiency
to Tax
1957
$12,209.33
$ 6,104.66
1958
7,055.10
3,527.55
1960
543.08
271.54
1961
1,566.16
1,102.17
The issues presented are the correctness of the respondent's determination, based on a net worth computation, that petitioners understated their income on their Federal income tax returns for the years 1956, 1957, 1958, 1960, and 1961, and the determination that such understatements were due to fraud with intent to evade tax. The parties agree that the deficiencies for the years 1956 and 1957 are barred by the statute of limitations unless fraudulent understatements of income are found for those years. Findings of Fact Some of the facts were stipulated, and those facts are so found. During the taxable years 1956 through 1961, Marvin E. Hinson and Pauline Hinson were married. During these years they were both residents of Wilmington, *249 North Carolina, but were not living together as husband and wife. For the taxable year 1956, Marvin E. Hinson filed a separate Federal income tax return with the district director of internal revenue at Greensboro, North Carolina. For the years 1957 through 1961, Marvin E. Hinson and Pauline Hinson filed joint income tax returns with the district director of internal revenue at Greensboro, North Carolina. During the years 1956 through 1958, two of petitioner's children resided with Pauline Hinson. During 1959, only one child resided with Pauline Hinson. Since Pauline Hinson is a party in docket No. 4108-64 solely because petitioners filed joint returns for some of the years in question, "petitioner", in the singular, will be used to refer to Marvin E. Hinson. Petitioner was born February 27, 1915, near Staley, North Carolina. He attended Randolph County public schools and completed his formal education with the fifth grade. Soon after leaving school, petitioner was employed by his grandfather in sawmilling and general farming. This employment was in 1929 or the early 1930's. After leaving employment with his grandfather, petitioner operated a produce truck for a while and then worked *250 for Cape Fear Transport Company and Sing Oil Company as a truck driver. In 1942, petitioner purchased a gasoline transport truck from Sing Oil Company for $3,000 and started operating his own transportation business, later to be known as Hinson Transport Company. Hinson Transport Company was operated as a sole proprietorship from 1942 until 1961, and over these years was expanded into a multitruck operation hauling many different types of commodities. Petitioner organized another sole proprietorship in 1948, Hinson Oil Company, which was engaged in selling gasoline and other petroleum products at retail through the operation of a service station and at wholesale to other service stations. Although Hinson Oil Company was not affiliated with any major oil company, it has purchased petroleum products from them. Hinson Transport Company transported petroleum products for Hinson Oil Company. Hinson Oil Company is still in operation. In 1957, petitioner organized another sole proprietorship, Hinson Truck Sales and Service, which was an International Harvester truck dealership selling trucks and trailers and maintaining a stock of truck parts and doing truck maintenance. Petitioner *251 was also engaged during the years 1956 through 1961 in the operation of Continental Construction Company. This business was initially operated as a partnership by petitioner and S. E. Cooper, but in September of 1955, the business was incorporated, and petitioner and Cooper transferred their partnership interests to the newly-formed corporation in exchange for its stock. Jack Scruggs, Jr., then obtained an equal interest in the corporation by giving the corporation his note in exchange for stock, but the note was never paid and his stock was cancelled in 1957. Continental Construction Company engaged in various types of construction using heavy earthmoving and roadway equipment. Most of its work was under various government contracts. In 1961, petitioner purchased S. E. Cooper's stock and became the sole stockholder of Continental Construction Company. During the taxable years 1956 through 1961, petitioner did not understand detailed principles of accounting and tax law, but he was successful in handling business transactions. He has been able to maintain control over the operation of his service station and has made spot checks on his bookkeepers and employees handling cash. His *252 service station maintains an adequate daily sales and cash report record with which the amount of cash in the cash register is reconciled. Petitioner has been able to review and analyze these reports to ascertain whether, for a particular day's operations, there has been a cash overage or shortage. Petitioner did not participate in the accounting or bookkeeping of his businesses. He hired bookkeepers and accountants, who were adequate and competent in ability, to keep the books of three proprietorships, and he did not make deposits or write checks for his businesses. Petitioner did have problems with several of his bookkeepers, partly because of alleged dishonesty. Anytime that petitioner suspected improper conduct on the part of any of his bookkeepers, he hired an accountant or detective to investigate the bookkeeper's work and activities. Petitioner also relied on others to handle the bookkeeping activities of Continental Construction Company. While they were with the corporation, the other two stockholders of Continental Construction Company, S. E. Cooper and Jack Scruggs, Jr., with the assistance of the certified public accounting firm of Cherry, Bekaert & Holland, supervised *253 the bookkeepers. The books and records of petitioner were audited by the Internal Revenue Service for the years 1948 through 1951, and petitioner paid certain deficiencies for those years. These deficiencies were determined by use of the net worth method. The respondent determined that petitioner's adjusted gross income shown on his returns should be increased by $15,000.69 for 1948, $2,638.82 for 1949, $5,733.34 for 1950, and $7,388.20 for 1951. At that time, petitioner was advised by a revenue agent to obtain the services of a public accountant so that adequate books and records could be established as a foundation for the preparation of accurate income tax returns. Petitioner followed this advice and sometime during 1956 engaged the firm of Cherry, Bekaert & Holland to prepare income tax returns and financial statements for the year ended December 31, 1955, and to install a double entry accounting system that would record the income and expenses of Hinson Oil Company and Hinson Transport Company as separate units, thereby permitting the two businesses to maintain their records separately. The financial statements were to be prepared without audit of petitioner's original books *254 of entry. Cherry, Bekaert & Holland was also retained to set up the books of Hinson Truck Sales and Service in 1957 and to prepare profit and loss statements for that proprietorship from 1957 through 1961. The firm also rendered accounting services to Continental Construction Company during a portion of the years 1956 through 1961. In addition, Cherry, Bekaert & Holland assisted petitioner in the hiring of new bookkeepers for his businesses and prepared petitioner's income tax returns for the years 1956 through 1961. Petitioner paid a total of between $8,000 and $11,000 in fees to Cherry, Bekaert & Holland for their services. Cherry, Bekaert & Holland prepared petitioner's returns by working from a trial balance taken from petitioner's general ledgers. The firm did not examine petitioner's journal except as needed to refer to a particular item. Petitioner filed no income tax returns for the years 1930 through 1946. For the years 1948 through 1955, petitioner's adjusted gross income, computed in audit examinations by the Internal Revenue Service for 1948 through 1951 and taken from petitioner's income tax returns for 1952 through 1955, was $19,000.68 for 1948, $9,983.76 for 1949, *255 $9,733.33 for 1950, $11,388.19 for 1951, $5,099.64 for 1952, $4,261.21 for 1953, $7,630.66 for 1954, and $6,719.17 for 1955. During the years 1948 through 1952, petitioner's family consisted of himself, his wife, and their four children, and he was entitled to six personal exemptions. He was entitled to four personal exemptions for 1954 through 1958, three exemptions for 1959, and two exemptions for 1960 and 1961. Petitioner has maintained a modest standard of living throughout his life. During the years 1956 through 1961, petitioner and his wife were not on the best of terms. Petitioner has for several years suffered from a stomach ailment that required treatment by a doctor. During the years 1956 through 1961, petitioner did not have a personal checking account. Many of his personal expenses were paid by his businesses and charged to his drawing accounts. For the purpose of obtaining credit, petitioner in his own name or in the name of Hinson Transport Company, submitted financial statements to Security National Bank and Morris Plan Bank of Wilmington. Petitioner's cash on hand and in banks, as shown by such statements, was $15,900 on October 30, 1947, $5,317.04 on November 30, 1948, $7,000 *256 on April 29, 1949, and $4,375 on May 31, 1949. From June 30, 1950, through May 23, 1952, petitioner, on behalf of Hinson Transport Company, obtained a number of new loans from the Bank of Wilmington, Wilmington, North Carolina (now North Carolina National Bank). These loans were all based on approximately 30-day promissory notes, all bearing interest at 6 percent, and secured by chattel mortgages on truck tractors and trailers. These notes were each renewed a number of times so that some amount of principal was always outstanding during this period. At one point the amount petitioner owed on these notes totaled $10,400. On May 29, 1951, petitioner borrowed $3,500 from Security National Bank, Wilmington, North Carolina, on a 90-day note bearing interest at 6 percent and secured by a deed of trust on a parcel of petitioner's real property. After several renewals, this note was repaid in full on November 28, 1952. Security National Bank made this $3,500 loan to petitioner after investigating his financial status. The investigation included a complete financial statement as of May 22, 1951. On this financial statement, petitioner stated that his cash on hand was $200 and his cash *257 in banks was $2,100. Security National Bank's investigation also indicated that in 1951 the real property pledged as security for the $3,500 loan had a valuation of $3,550 but was subject to liens for unpaid taxes due New Hanover County, North Carolina, in the amount of $46.10 for 1949 and $41.00 plus 3 percent interest for 1950. The Bank of Wilmington also made loans to petitioner. In October of 1953, petitioner borrowed $4,000 from the Bank of Wilmington. This loan was to be repaid in 12 monthly installments of $334 each. In December of 1955, petitioner borrowed $3,182 from the Bank of Wilmington to purchase a new 1956 Lincoln automobile. The loan was to be repaid in 12 monthly installments of approximately $265 each. In January of 1956 petitioner borrowed $4,200 from the Bank of Wilmington to purchase a new 1956 White tractor. The loan was to be repaid in 12 monthly installments of $350 each. Petitioner was required to file Intangible Personal Property Tax returns with the State of North Carolina, setting forth certain assets owned as of December 31 of each year. The returns required the reporting of money on hand or on deposit other than in North Carolina banks. Petitioner *258 did not file such a return for the year 1954. Petitioner filed returns reporting total money on hand or on deposit other than in North Carolina banks of $1,279.30 for the year 1955, $1,500.00 for 1956, and $1,426.32 for 1957. Agreed audit deficiencies, including applicable penalties and interest, for petitioner's taxable years 1948 through 1951 were assessed on January 15, 1953. A first notice of assessment was sent to petitioner on January 23, 1953, followed by a second notice on March 6, 1953. When assessments remained unpaid, a delinquent account notice was issued on March 31, 1953, and notices of Federal tax liens were filed on April 16, 1953, no part of the tax having been paid prior to that date. Petitioner paid the agreed deficiencies over the next 7 months, and the Federal tax liens were released on November 16, 1953. On January 28, 1957, petitioner opened a savings account of $10,000 at Security National Bank in his own name and a savings account of $10,000 in trust for his daughter, Shirley Jean Sullivan. In April of 1957, petitioner borrowed $10,000 from Security National Bank and put the proceeds into Hinson Truck Sales and Service as an initial capital investment. *259 Soon after this, petitioner borrowed a second $10,000 from Security National Bank and invested the proceeds in Hinson Truck Sales and Service. The loans were each secured by one of the two savings accounts mentioned above. About June 30, 1958, petitioner withdrew $10,000 from the savings account in trust for his daughter and paid off one of the loans from Security National Bank. About December 31, 1958, petitioner withdrew $10,000 from the savings account in his own name and paid in full the other loan from Security National Bank. Interest was credited by the bank to these accounts in the amount of $512.10 for the year 1957, $471.93 for 1958, $30.36 for 1959, $27.67 for 1960, and $31.56 for 1961. Such interest was not reported on petitioner's income tax returns for any of the years 1957 through 1961. In 1956, petitioner received at least $4,965.75 income from rental of a bulldozer to Continental Construction Company during April, May, and June of 1956 at a fixed rate of $10 per hour. Only $2,950.45 of this amount was reported as income on petitioner's return for that year. In 1957, petitioner rented a D-7 Caterpillar tractor and accessories to Continental Construction Company *260 for which he received $3,000 in rental income. This rental income was not reported by petitioner on his 1957 income tax return. On October 24, 1957, petitioner sold a D-7 Caterpillar tractor to Continental Construction Company for $8,032.50. This sale was not reported on petitioner's 1957 income tax return. On January 24, 1957, petitioner purchased 250 shares of stock of the Canadian Limited Company at a cost of $4,656.25. Petitioner sold these shares on June 7, 1957, for $7,266.25. This purchase and sale was not disclosed to Cherry, Bekaert & Holland and was not reported on petitioner's 1957 income tax return. During 1958, Continental Construction Company sold a one-third interest in a joint venture, Stream Clearing Construction Company, to the other members of the joint venture for a total price of $20,000, which was to be paid on an installment basis as work progressed on the joint venture's project. Petitioner and S. E. Cooper bypassed the corporation and received directly $6,116.72 during 1958 from this sale, which they divided equally. Petitioner then loaned $3,000 of this sum back to the joint venture to help finance completion of the project. After this transaction, petitioner *261 received no further money from the joint venture, not even his $3,000. These transactions were not reported on petitioner's 1958 income tax return. In 1959, petitioner sold a Ford truck to Continental Construction Company for $700. This sale was not reported on petitioner's 1959 income tax return. Information on petitioner's income tax returns that was not related to his three businesses was supplied to Cherry, Bekaert & Holland by either petitioner or his bookkeepers. In May of 1962, one of petitioner's bookkeepers asked Cherry, Bekaert & Holland if $10,000 received from the sale of motor carrier rights of Hinson Transport Company had been reported on petitioner's 1961 income tax return. This sale had not been reported on petitioner's return, and an amended return for petitioner was therefore filed for the year 1961. On March 15, 1955, petitioner rented a safe deposit box at Security National Bank. Petitioner entered the safe deposit box on April 19, 1955, and January 28, 1957. Because of the method employed by the bank in keeping safe deposit box access tickets, any entry into petitioner's box other than [by] those two would be improbable, although not impossible because *262 of the movement of bank records in a merger after the above dates of entry. The following schedule correctly reflects petitioner's net worth and adjusted gross income at December 31 for each of the years 1955 through 1961: Description
12/31/55
12/31/56
12/31/57
12/31/58
Net Worth per Books: Hinson Oil Company
$60,468.45
$65,101.47
$ 70,947.50
$ 66,841.57
Hinson Transport Company
(4,604.39)
Hinson Truck and Sales
10,758.36
38,015.30
Assets not Recorded on
Books: Cash
24,000.00
24,000.00
4,000.00
0
Notes Receivable
1,800.00
1,800.00
9,082.75
Corporate Stock
2,766.68
Fruehauf Trailers
386.50
4,817.70
7,069.97
Accounts Receivable
8,500.00
Investment in Capital
Stock - Industrial
Proper-
ties, Inc.
1,000.00
1,000.00
Savings Account -
Security National Bank,
Wil-
mington, North Carolina
20,491.94
1,000.92
Real Estate
2,995.00
2,995.00
2,995.00
2,595.00
Total Net Worth
$87,463.45
$94,282.97
$116,810.50
$132,267.80
Net Worth Increase
$ 6,819.52
$ 22,527.53
$ 15,457.30
Add: Personal Property Removed
from Net Worth
Personal Living Expenses
5,235.53
5,244.26
5,281.42
Federal and State Income
1,286.41
253.77
5,748.46
Taxes
Fines and Penalties Paid
Less: Non-taxable Capital Gains
(350.00)
Dividend Exclusion
(50.00)
Corrected Adjusted Gross
$13,341.46
$ 28,025.56
$ 26,087.18
Income
Adjusted Gross Income as
3,297.12
23,028.68
6,494.80
Reported
Increase (Decrease) in
$10,044.34
$ 4,996.88
$ 19,592.38
Adjusted Gross Income
*263 Description
12/31/59
12/31/60
12/31/61
Net Worth per Books: Hinson Oil Company
$ 75,797.99
$ 78,820.90
$ 87,638.00
Hinson Transport Company
(17,326.45)
(24,068.98)
(29,486.71)
Hinson Truck and Sales
49,290.20
52,948.34
43,114.34
Assets not Recorded on
Books: Cash
0
0
6,250.00
Notes Receivable
5,706.55
7,175.00
7,175.00
Corporate Stock
2,766.68
2,766.68
6,516.68
Fruehauf Trailers
6,909.26
3,368.09
3,472.00
Accounts Receivable
1,000.00
4,100.00
7,802.00
Investment in Capital
Stock - Industrial
Proper-
ties, Inc.
1,000.00
1,000.00
1,000.00
Savings Account -
Security National Bank,
Wil-
mington, North Carolina
1,030.27
1,057.13
1,077.62
Real Estate
2,595.00
2,595.00
2,595.00
Total Net Worth
$128,769.50
$129,762.16
$137,153.93
Net Worth Increase
[ 3,498.30)
$ 992.66
$ 7,391.77
Add: Personal Property Removed
1,500.00
2,500.00
from Net Worth
Personal Living Expenses
5,345.54
6,894.12
6,358.13
Federal and State Income
1,108.13
1,071.05
1,759.13
Taxes
Fines and Penalties Paid
571.05
26.00
Less: Non-taxable Capital Gains
(5,000.00)
Dividend Exclusion
(50.00)
(50.00)
(50.00)
Corrected Adjusted Gross
$ 4,405.37
$ 9,478.88
$ 12,985.03
Income
Adjusted Gross Income as
5,433.36
7,403.51
8,453.93
Reported
Increase (Decrease) in
$ (1,027.99)
$ 2,075.37
$ 4,531.10
Adjusted Gross Income
*264 The amounts and percentages of petitioner's corrected adjusted gross income, adjusted gross income reported, and understatement of adjusted gross income for each of the taxable years 1956 through 1961 are as follows: ADJUSTED GROSS INCOME
Understatement
or Over-
Year
Corrected
%
Reported
%
statement *
%
1956
$13,341.46
100
$ 3,297.12
24.71
$10,044.34
75.29
1957
28,025.56
100
23,028.68
82.17
4,996.88
17.83
1958
26,087.18
100
6,494.80
24.89
19,592.38
75.11
1959
4,405.37
100
5,433.36
123.33
1,027.99 *
23.33 *
1960
9,478.88
100
7,403.51
78.11
2,075.37
21.89
1961
12,985.03
100
8,453.93
65.11
4,531.10
34.89
Totals
$94,323.48
100
$54,111.40
57.37
$40,212.08
42.63
Ultimate Findings of Fact On December 31, 1955, petitioner had in his safe at Hinson Oil Company $24,000 in cash. Petitioner transferred $20,000 of this cash from his safe to his safe deposit box at Security National Bank sometime in 1956. Early in 1957, petitioner then removed this cash from his safe deposit box and with it opened two savings accounts at Security National Bank. The remaining $4,000 in petitioner's *265 safe was retained by him and ultimately expended during 1958 on behalf of Hinson Truck Sales and Service. Opinion Respondent determined petitioners' income for the years 1956 through 1961 under the net worth method of income reconstruction. Petitioner contends that the net worth method may not be used in this case since his books and records were accurate, adequate, and complete. In support of this contention, petitioner makes a detailed argument based on Holland v. United States, 348 U.S. 121 (1954), that if a taxpayer's books are accurate, the net worth method may not be used. Petitioner then argues that proof of inaccurate books is a condition precedent to the use of the net worth method. We do not agree with petitioner's reading of the Holland case. It seems clear to us that the net worth method may be used to test the accuracy and adequacy of a taxpayer's books regardless of whether such books are on their face accurate or inaccurate. This view appears to have the clear support of the cases that have dealt with this problem since the Holland decision. See, e.g., Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), affg. a Memorandum Opinion *266 of this Court; Davis v. Commissioner, 239 F. 2d 187 (C.A. 7, 1956), affg. a Memorandum Opinion of this Court, cert. denied 353 U.S. 984 (1957); Vloutis v. United States, 219 F. 2d 782 (C.A. 5, 1955); Kite v. Commissioner, 217 F. 2d 585 (C.A. 5, 1955), affg. in part a Memorandum Opinion of this Court; Morris Lipsitz, 21 T.C. 917 (1954), affd. 220 F. 2d 871 (C.A. 4, 1955), cert. denied 350 U.S. 845 (1955). Moreover, petitioner's books were not accurate. We have detailed in our Findings of Fact a number of income items specifically omitted by petitioner from his books and the income tax returns he filed for the years in question. We therefore see no merit in petitioner's contention and are fully satisfied that respondent was justified in his use of the net worth method. The parties have stipulated in this case to the correctness of all items appearing in the net worth computation of respondent with two exceptions: the amount of petitioner's cash on hand as of the beginning of 1956, the first tax year in question, and the amount of petitioner's personal expenses during all of the years in question. *267 As to these items, the petitioner has the burden of proof. Clark v. Commissioner, 253 F. 2d 745 (C.A. 3, 1958), affg. in part and revg. in part a Memorandum Opinion of this Court; Joseph B. Moriarty, 18 T.C. 327 (1952), affd. per curiam 208 F. 2d 43 (C.A.D.C. 1953). Petitioner maintains that on December 31, 1955, he had in his safe at Hinson Oil Company $24,000 or $25,000 in cash. Petitioner claims that respondent erred in not including this amount in calculating petitioner's opening net worth for the years in question. Petitioner's claim is a common one in cases of this type. The Supreme Court in the Holland case referred to the claim of opening cash on hand as a "favorite defense" (348 U.S. 127). However, the Supreme Court recognized in Holland that "the correctness of the result depends entirely upon the inclusion in * * * (opening net worth) of assets on hand at the outset" (348 U.S. 132). We must therefore never take lightly a taxpayer's contentions as to an opening cash accumulation. We have found that petitioner did have $24,000 in cash at the beginning of 1956. Although there is a great deal of conflicting *268 evidence in this case as to the existence of petitioner's cash hoard, we will summarize the arguments and evidence that have led us to our conclusion. Not only did petitioner testify as to the existence of his cash hoard, but two witnesses - one a close friend of petitioner's and one a former business associate of petitioner's - also testified that they saw counted, or themselves counted, approximately $25,000 cash in petitioner's safe in the fall of 1955. One of these two witnesses testified that he saw this cash again in the early spring of 1956. The testimony of petitioner and the two witnesses was substantially consistent in view of the time that has passed since these events. Although the two witnesses do have close connections with petitioner and the testimony of one witness was somewhat inconsistent with a prior written statement of his made to respondent during the investigation of this case, we have no substantial reason for doubting the truthfulness of the witnesses, and, as direct testimony, their assertions are entitled to great weight. Respondent argues that petitioner filed no returns prior to 1947 and that this is evidence that his income during those years was *269 insufficient to require them. Respondent further argues that petitioner's income from 1948 through 1955 as shown by his returns and a prior net worth computation for the years 1948 through 1951 was not sufficient to allow accumulation of any substantial amount of cash. Respondent also points out that petitioner made no claim of a cash hoard in respondent's prior examination of petitioner's returns for the years 1948 through 1951. These arguments are persuasive, but there exists the possibility that the cash hoard could have been accumulated from income not reported on petitioner's income tax returns for years prior to 1956. In addition, petitioner's standard of living was modest, and in 1942 he purchased his first truck for $3,000 cash that he had accumulated between 1930 and 1942. Furthermore, if it were possible for him to accumulate $3,000 cash during his low income years of 1930 to 1942, it might have been possible for him to accumulate $25,000 cash during his higher income years of 1942 through 1955 - an accumulation of slightly less than $2,000 per year. From 1950 through 1956, petitioner borrowed money at interest on a number of occasions and renewed a number of such loans. *270 In 1955, petitioner borrowed money to buy a luxury automobile. In 1953, it was necessary to assert Federal tax liens to collect petitioner's earlier deficiency in income taxes. As of May 1951, real property taxes due Hanover County, North Carolina, for the years 1949 and 1950 had not been paid by petitioner. Petitioner's North Carolina intangible tax returns for the years 1955, 1956, and 1957 showed no substantial cash. All of these facts tend to indicate that the petitioner lacked any substantial cash hoard. However, some people borrow money, or defer paying their obligations, even though they have cash on hand. Finally, the respondent attempts to impeach the testimony of the witnesses who claim to have counted, or seen counted, the cash hoard by showing that the petitioner could not have transferred the hoard from his safe in Hinson Oil Company to his safe deposit box at the time he claims to have done so. Petitioner testified that he had approximately $24,000 cash in December of 1955. On March 15, 1955, petitioner rented a safe deposit box at Security National Bank. Petitioner testified that in March or April of 1956, he took $20,000 of this cash from his safe at Hinson Oil Company *271 and placed it in his safe deposit box. Then, petitioner testified that on January 28, 1957, he entered his safe deposit box, removed the $20,000 in cash, and opened two savings accounts at Security National Bank, each in the amount of $10,000. Respondent has argued that Security National Bank's records show only two entries into petitioner's safe deposit box - on April 19, 1955, and January 28, 1957. An official from the bank testified that it would be improbable that any other entries into petitioner's safe deposit box were made; but such officer also testified that there was a subsequent merger of the bank in which the bank's records were moved, and that therefore other unrecorded entries were possible. Respondent then points out that if petitioner entered his safe deposit box only in the spring of 1955, the testimony of the two witnesses who allegedly saw the cash in the fall of 1955 must be false. Respondent argues that petitioner could not have put the cash in his safe deposit box on January 28, 1957, since that is the day that petitioner testified he removed the cash. Respondent's argument is very persuasive. Nevertheless, if we refuse to believe petitioner's testimony in *272 regard to his cash hoard, we can find no probable source for the $20,000 deposited by petitioner in the two savings accounts. The existence of this cash hoard in early 1957 is, in our view, the decisive consideration when combined with the testimony of petitioner and two witnesses. Petitioner had to have cash approximating $20,000 at the beginning of 1956, or he had to accumulate in 1956 whatever amount of the $20,000 cash hoard he lacked at the beginning of the year. If petitioner had accumulated this amount during 1956, his income for that year would have been $20,000 greater than even respondent computed on his statement of petitioner's net worth. It seems unlikely that the petitioner could have accumulated most of such cash hoard during 1956; it seems more likely that he had the cash hoard at the beginning of the year. In summary, we concluded that the most likely account of what happened is that the petitioner had a cash hoard of about $24,000 at the beginning of 1956. We are influenced by the testimony of the witnesses who claim to have seen the money and by the existence of a large cash hoard in early 1957. Although the respondent did succeed in establishing that there was *273 no recorded entry into the safe deposit box in the spring of 1956, as the petitioner claimed, we think that the course of events recounted by the petitioner can be reconciled by the assumption that there must have been some other entry into the safe deposit box - the record of which is now lost. The second item in respondent's net worth computations that is in dispute is the amount of petitioner's personal living expenses during the years 1956 through 1961. Respondent determined petitioner's personal living expenses to be $5,235.53 in 1956, $5,244.26 in 1957, $5,281.42 in 1958, $5,345.4 in 1959, $6,894.12 in 1960, and $6,358.13 in 1961. Petitioner disputes $2,600 each year of respondent's determination of personal expenses. In other words, petitioner maintains that his personal expenses for these years amounted to $2,635.53 in 1956, $2,644.26 in 1957, $2,681.42 in 1958, $2,745.54 in 1959, $4,294.12 in 1960, and $3,758.13 in 1961. Petitioner and his wife were separated during the years 1956 through 1961, and in each of these years, petitioner contributed to his wife's support in the amount of $2,208. In computing petitioner's personal expenses for these years, respondent added to *274 these support payments petitioner's life insurance payments made by check, his medical expenses paid by check, his property taxes paid by check, and personal withdrawals by petitioner from his business. Respondent's calculations appear to us to be very reasonable. Petitioner would have us believe that in several of these years, his personal expenses, excluding the amounts paid for his wife's support, amounted to only $400 or $500 per year. We cannot accept petitioner's calculations, for petitioner has given us no evidence to support his position except for a few statements that his standard of living was modest and frugal. We have therefore accepted respondent's calculations as to petitioner's personal living expenses. Since the remaining items in respondent's net worth calculations were stipulated by the parties to be correct, we accept the net worth computation set out in our Findings of Fact as accurately reflecting petitioner's adjusted gross income for each of the years in question. We must now decide whether the understatement by petitioner of his adjusted gross income on his Federal tax returns for 5 out of the 6 years from 1956 through 1961 constitutes fraud. Respondent *275 has the burden of proof with respect to fraud (section 7454(a)), and he must establish by clear and convincing evidence that at least some part of the deficiency for each year at issue is due to fraud with intent to evade tax. E. S. Iley, 19 T.C. 631 (1952), acq. 1953-2 C.B. 4; Arlette Coat Co., 14 T.C. 751 (1950). It is well settled that the mere understatement of income alone is not proof of fraud, but consistent and substantial understatement of income is highly persuasive evidence of intent to defraud. Schwarzkopf v. Commissioner, supra; Davis v. Commissioner, supra. See also, Holland v. United States, supra.Such consistent understatements are even more convincing when supported by other circumstances pointing to an intent to evade tax. Gatling v. Commissioner, 286 F. 2d 139 (C.A. 4, 1961), affg. a Memorandum Opinion of this Court. The whole record must be searched for the intent to defraud. E. S. Iley, supra. In approximate figures, petitioner reported 25 percent of his adjusted gross income for the year 1956, 82 percent of his adjusted gross income for 1957, 25 percent *276 for 1958, 123 percent for 1959, 78 percent for 1960, and 65 percent for 1961. The total understatement for these 6 years was $40,212.08, and for the 6 years as a wholey petitioner reported only 57.37 percent of his total adjusted gross income. We know that a part of this understatement was due to specific transactions set forth in our Findings of Fact. Petitioner attempts to explain his understatements of income by arguing that he was unable personally to keep complete and adequate records and, because of his lack of education, that he was unfamiliar with the Federal income tax laws. Consequently, petitioner argues that he was forced to rely on a firm of certified public accountants to prepare his tax returns, and these accountants should have been able to prepare correct returns. We cannot accept petitioner's explanations. Petitioner did testify that he discussed a number of the transactions not reported on his tax returns with his bookkeepers or accountants. However, we have not been able to find such as a fact. There was ample testimony in the record to the effect that petitioner's bookkeepers were adequate and competent in ability. The accountants from Cherry, Bekaert & Holland *277 that worked on petitioner's books seemed very well qualified. We cannot believe that had petitioner informed his bookkeepers or accountants of these transactions, the transactions - substantial in number and amount - would have been omitted from petitioner's returns. We accordingly cannot find that petitioner furnished his bookkeepers and accountants all the information necessary to file accurate and complete income tax returns, and we cannot find that the specific omission of a number of transactions from the returns was due to the fault of petitioner's bookkeepers or accountants. Petitioner did not have to be familiar with income tax law or be able to keep a set of books to report his correct income on his tax returns. All he had to know was that when he received money, he should tell his bookkeepers. We cannot understand how petitioner can plead ignorance when in 1956 he rented a bulldozer to Continental Construction Company and received rents of $4,965.75, while only reporting $2,950.45. Furthermore, petitioner's income tax returns for the years 1948 to 1951 had been audited by respondent. Petitioner was told at that time that his books were inadequate, and respondent advised *278 that petitioner find competent accounting aid. Petitioner followed this advice, but we think that because of this audit examination and the resulting assessment, petitioner should have been very conscious that in any transaction in which he either received or disbursed money for business purposes, he should inform his bookkeepers to ensure that the transaction would be reported on his tax returns. We accordingly find that petitioner's failure to report all of his adjusted gross income on his Federal income tax returns for the years 1956, 1957, 1958, 1960, and 1961 was due to fraud with intent to evade tax. The respondent's assertion of fraud penalties under section 6653(b) is therefore proper, and, in accord with section 6501(c)(1), the statute of deficiencies in tax for the years 1956 and 1957. Decisions will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩